[Civ. No. 13669. Third Dist. Apr. 24, 1973.]

JAMES F. GARNER, Plaintiff and Appellant, v.
AMERICAN MUTUAL LIABILITY INSURANCE COMPANY,
Defendant and Respondent.

## Counsel

Nathaniel S. Colley for Plaintiff and Appellant.

Anderson & Geary, Downey, Brand, Seymour & Rohwer and John F. Downey for Defendant and Respondent.

Calvin T. Goforth as Amicus Curiae on behalf of Defendant and Respondent.

## Opinion

**REGAN, J.**—Defendant had insured plaintiff, a physician, against medical malpractice claims for a maximum amount of $100,000. A malpractice action against plaintiff had resulted in a jury verdict and judgment against plaintiff in the sum of $225,000. Thereafter, plaintiff filed the instant action against defendant insurance company for damages in the amount of $625,000 on the ground of bad-faith refusal to settle a claim against him within the policy limits. After trial by the court, judgment was rendered for defendant, and plaintiff appeals.

### FACTS

Defendant issued a group malpractice insurance policy to the Sacramento Society for Medical Improvement[1] under which individual doctors who were members of the society could obtain malpractice insurance for the amount they desired and the premium they were willing to pay. Under the provisions of an agreement between defendant, the society and its certified members, a medical review committee of physician-members of the society was established for the purpose of reviewing any claim of malpractice against an insured doctor to determine whether or not there had been a deviation from the appropriate standard of medical care. This committee would review each case to decide, from the medical standpoint, whether there had been malpractice.

While the insurance policy was in effect, one Geneva Buford became a patient of plaintiff, was treated by him and died while under his care. Her heirs sued plaintiff and others for malpractice resulting in the award.

Under the terms of the policy of insurance, defendant insurance company was obligated "To defend each claim and suit, even though wholly without merit, brought against the insured, to enforce any liability imposed by

---

[1] Also known as Sacramento County Medical Society.

law and seeking payment of damages . . . claimed to arise out of the practice of the insured's profession . . . .

"To pay on behalf of the insured all sums which the insured shall become obligated to pay" arising from such claim or suit and within the policy limits.

Defendant insurance company chose Mr. Huber and Mr. Gray as counsel to defend the case. Mr. Gray is also counsel for the society on a regular basis. Before the conclusion of trial, Huber and Gray twice presented the case to the medical review committee, and on each occasion the committee concluded there had been no malpractice on plaintiff's part. The second meeting took place after a settlement offer within the policy limits had been made by counsel for the Buford heirs and after plaintiff had requested Mr. Gray to try to settle the case on his behalf.

The policy provided that: "The company shall not settle or compromise any claim or suit [for malpractice] without the consent of the Medical Review and Advisory Committee or similar committee of the Sacramento Society for Medical Improvement *or the insured* . . . ." (Italics added.) However, as a matter of firm, fixed custom or practice, established by the society and defendant, defendant will not settle any case where the medical committee concludes there has been no malpractice.

Since the settlement offer was not accepted and no counteroffer at a lower figure was made by defendant, the case proceeded, leaving plaintiff with a personal judgment obligation of $125,000 over and above his policy limits.

In the instant case, counsel for defendant insurance company (Mr. Gray) testified that he attempted to settle the case within the policy limits, and that he did so by going to the medical review committee a second time (after receiving a request to settle from plaintiff). He asked the committee again to review the matter to determine whether there was any malpractice. Mr. Gray further testified that the decisions on malpractice of the medical board were never considered to be irrevocable. It was not denied at trial, nor is it contended by defendant on appeal, that defense counsel was ever permitted to settle any case unless and until the medical review committee found there was malpractice. This was one of the findings of the trial court.

Both trial attorneys for plaintiff in the malpractice case testified in the instant case that from their years of experience in handling malpractice cases they had concluded that even if malpractice were found by the jury,

the verdict would not exceed the policy limit of $100,000. Defendant herein also produced testimony from the attorneys for the codefendant Sutter Hospital that they were "shocked" that the verdict was so high, and that they had estimated it could not have gone over $50,000 to $80,000. Similar testimony was elicited from counsel for claimant and defendant's claims manager.

The trial court found, inter alia, that the malpractice case had been fully and capably investigated by attorneys Gray and Huber; that it was concluded in good faith by defendant that there was no reasonable likelihood of a verdict in favor of the Buford heirs; the defendant concluded again in good faith, after review of the case that, even if plaintiff were held liable, the verdict would not go over $100,000; and that even if it went over $100,000, it would be shared by Sutter Hospital (this did not occur). The trial court further found, inter alia, that the rejection of the settlement offer of the Buford heirs and the refusal to make a counteroffer would have occurred even if there had been no limit at all on the insurance company's liability; and that there was no bad faith or negligence in the handling of the case. The court concluded, therefore, that defendant did not breach its implied covenant that it would exercise good faith and fair dealing toward plaintiff, in refusing to settle the malpractice case within the policy limits.

The crucial issue raised by this appeal is whether or not liability exists for breach of a duty by defendant to accept or initiate reasonable settlement offers within the policy limits, given the factual context in which the case arose.

The law in this state is that in every liability insurance policy there is an implied covenant of good faith and fair dealing which includes the duty to accept settlement offers under certain conditions. The insurer is required to concern itself with the interests and welfare of the insured as well as its own interests and welfare, and in so doing must carefully and realistically assess the case against the insured as to the issue of liability and as to the potential magnitude of possible damage awards, to determine the financial risk to each party resulting from failure to settle or attempt to settle. (See, e.g., *Brown* v. *Guarantee Ins. Co.* (1957) 155 Cal.App.2d 679, 689 [319 P.2d 69].)[2] It is true that if an insurer undertakes to carry

---

[2]Some of the other leading cases developing this rule are the following: *Billington* v. *Interinsurance Exchange* (1969) 71 Cal.2d 728 [79 Cal.Rptr. 326, 456 P.2d 982]; *Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654 [328 P.2d 198, 68 A.L.R.2d 883]; *Shapero* v. *Allstate Ins. Co.* (1971) 14 Cal.App.3d 433 [92 Cal.Rptr. 244]; *Marsango* v. *Automobile Club of So. Cal.* (1969) 1 Cal.App.3d 688 [82 Cal.

out the duty just described, it is a factual question whether or not the insurer has acted in good faith and has made a reasonable effort on behalf of the insured in its negotiating toward a settlement. (155 Cal.App.2d at p. 689.) However, the rule itself of course is a matter of law and requires that the insurer *at the very least* must itself consider and determine whether or not a settlement offer is in the best interest of the insured. If in failing to consider, accept, or make a reasonable settlement offer there has been actual bad faith on the part of the insurer, there is an obvious breach of duty to the insured. But actual bad faith (such as fraud, concealment or actual dishonesty) is not the only basis for recovery as a matter of law. This was made clear by the California Supreme Court in the leading case of *Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 430 [58 Cal.Rptr. 13, 426 P.2d 173], wherein that court held that liability is imposed not only for bad faith but also for failure to meet the duty to accept reasonable settlements, a duty included within the implied covenant of good faith and fair dealing. (See also *State Farm Mut. Auto. Ins. Co.* v. *Allstate Ins. Co.* (1970) 9 Cal.App.3d 508, 530 [88 Cal.Rptr. 246].)

■ There is a clear implicit consensus in the cases on this subject that the duty to consider and weigh all the factors bearing upon the advisability of a settlement in the interests of the insured is upon the *insurance carrier*. Obviously this legal duty is exercised normally in conjunction with the judgment of counsel defending the cases against the insured. It is equally obvious to us that neither the insured nor counsel can base its legal duty to its insured solely upon a finding by a medical review committee composed of physicians who are members of some local medical society. It is both conceded by the parties and found by the trial court that defendant insurance company will not settle any case unless the medical review committee of the Sacramento County Medical Society had first concluded there was malpractice. Defendant attempts to justify this practice by pointing out that the record contains evidence that 33 percent of the cases against member physicians insured by it are settled. This evidence is meaningless in connection with the issue here being dealt with because it consisted only of figures for *all* physicians who were insured

Rptr. 92]; *Kinder* v. *Western Pioneer Ins. Co.* (1965) 231 Cal.App.2d 894 [42 Cal. Rptr. 394]; *Critz* v. *Farmers Ins. Group* (1964) 230 Cal.App.2d 788 [41 Cal.Rptr. 401, 12 A.L.R.3d 1142]; *Martin* v. *Hartford Acc. & Indem. Co.* (1964) 228 Cal. App.2d 178 [39 Cal.Rptr. 342]; *Kelley* v. *British Coml. Ins. Co.* (1963) 221 Cal. App.2d 554 [34 Cal.Rptr. 564]; *Palmer* v. *Financial Indem. Co.* (1963) 215 Cal. App.2d 419 [30 Cal.Rptr. 204]; *Hodges* v. *Standard Accident Ins. Co.* (1961) 198 Cal.App.2d 564 [18 Cal.Rptr. 17]; *Davy* v. *Public National Ins. Co.* (1960) 181 Cal. App.2d 387 [5 Cal.Rptr. 488]; *Ivy* v. *Pacific Automobile Ins. Co.* (1958) 156 Cal. App.2d 652 [320 P.2d 140].

by defendant over a five-year period wherever they might be located. Moreover, the evidence did not reflect whether or not these settled cases were cases where malpractice had or had not been found by a local medical review committee.[3]

We conclude that whatever the "meticulous care" as claimed by defendant went into its handling of the malpractice case against plaintiff, that care did not include meticulous attention to the legal duty to make an independent determination of the possible benefits of settlement and the hazards of failure to settle.

Defendant carrier owed to plaintiff, as it owes to each insured member of the Sacramento County Medical Society, its independent evaluation of the risk to which plaintiff was exposed by reason of the malpractice litigation. This obligation included an informed and careful weighing of the medical factors of diagnosis and treatment in terms of acceptable medical standards in the community, and in this connection the scrutiny and recommendation of the medical review committee had an important part. (See, e.g., *Kenney* v. *Superior Court* (1967) 255 Cal.App.2d 106, 114 [63 Cal. Rptr. 84]; *Brown* v. *Superior Court* (1963) 218 Cal.App.2d 430, 434-435 [32 Cal.Rptr. 527].) But the evaluation included more. Since the ultimate determination of the risk and exposure of plaintiff was vested in 12 lay jurors in a courtroom, the obligation to protect plaintiff also included, of necessity, a careful measuring of the legal facets of the case, the probabilities of a verdict and its anticipated range if adverse, the strengths and weaknesses of all of the evidence to be presented on either side so far as known, the nature of the surgical or medical result, the experience and capacity of counsel, and the history of the particular jurisdiction in similar litigation. Finally, defendant owed to plaintiff its experience and expertise in total claims evaluation as an insurance company. In assessing plaintiff's exposure, it may not ignore its own claims assessment based upon its experience in the given geographic area with cases of similar nature and with similar medical results, if any. It must fairly and reasonably appraise and weigh a number of determinative factors including such ponderables as the relative appearance and likely appeal, or the lack thereof, of the claimant and its insured, as well as the known witnesses, together with the seriousness of the medical result. In short, it must bring to bear on the case on behalf of its insured an amalgam of medical, legal

---

[3]The implication of the evidence, in context, was that these settlements *were* either after malpractice had been found by a local medical review committee, or occurred at least in part somewhere else in the state or in the country. These committees now exist in over 20 California counties.

and claims judgments which dictate the course, nature and intensity of any pretrial settlement negotiations. In such a composite of judgments it may not ignore the desires or instructions of the insured, for in the final analysis the exposure, the ultimate risk of loss, is his.

By defendant's practice, the resolution of the critical question—to settle or not to settle—was vested in and delegated exclusively to the Medical Review Committee of the Sacramento County Medical Society. Regardless of the consultations and discussions which were had, the ultimate determination in the instant case was made by neither the insured member of the society nor the defendant carrier but by an independent committee of the society, which, no matter how well-meaning, bore neither the risk nor hazards of the loss. Such body held but a portion of the total expertise necessary to the making of a fully considered judgment based on those multiple factors which must be carefully weighed, measured and evaluated by professionals whose primary interest is the protection of the insured. We think the plaintiff, together with the insured members of the society, under the terms of the policy in question were and are entitled to this fuller protection.

The evidence is clear that the plaintiff not only gave his consent to the settlement of the case but urged settlement within the policy limits. Under the policy provisions, the plaintiff's consent alone sufficiently permitted settlement by the defendant insurer. However, such consent was rendered a nullity by the unilateral policy and practice of the defendant in refusing either to negotiate or consummate settlement where the Medical Review Committee of the Medical Society found no malpractice and on that basis, refused to consent to settlement.

The adoption of the foregoing policy and practice by the defendant not only deprived the defendant of the free and independent exercise of its own judgment in such settlements; it effectively nullified the provision in the policy permitting settlement with the consent *only* of the plaintiff. There is no substantial evidence in the record to support any finding that plaintiff had concurred in or approved any such practice which would deprive both himself and defendant of their independent judgments as to settlement.

It becomes unnecessary for us to rule upon the contentions of plaintiff as to bad faith of defendant being shown by such things as alleged failure to disclose obligations as to bond premiums and the like. Neither need we belabor the question of whether or not the policy imposed a

contractual obligation upon defendant to settle at the mere request of plaintiff as he contends on appeal.

The judgment is reversed as to liability and the trial court is directed to enter judgment for the plaintiff after trial on the single issue of amount of damages. Since a jury trial has been waived in this case, the issue and amount of compensatory damages, if any, over and above the $125,000 plus interest and costs to which plaintiff is entitled, shall be decided by the trial court on the basis of the transcript of the evidence on damages unless the trial court, after examination of the record, specifically elects to require the taking of additional evidence on the amount of compensatory damages, if any, over and above the aforementioned $125,000 plus interest and costs. We hold there is no sufficient evidence in the record relating to liability upon which to base any finding of bad faith. Accordingly, no award of exemplary damages shall be made.

Richardson, P. J., and Goldstein, J.,* concurred.

A petition for a rehearing was denied May 23, 1973, and the judgment was modified to read as printed above. Respondent's petition for a hearing by the Supreme Court was denied June, 20 1973.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.