554 So.2d 387 (1989)
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY
v.
Mary Nell HOLLIS, as administratrix of the estate of Joe S. Stokes, deceased.
87-808.
Supreme Court of Alabama.
August 4, 1989.
Rehearing Denied September 22, 1989.
Edgar M. Elliott III, Karon O. Bowdre and Norma Mungenast Lemley of Rives & Peterson, Birmingham, and W. Harold Albritton III of Albrittons, Givhan & Clifton, Andalusia, for appellant.
Frank J. Tipler, Jr. and John M. Pennington of Tipler and Tipler, Andalusia, for appellee.
PER CURIAM.
This action for negligent or wanton failure to settle a lawsuit and wanton failure to file a supersedeas bond is based upon the defense by State Farm of a personal injury action Douglas Lee Scott filed against Joe Stokes, State Farm's insured. In that action, the jury returned a $1,000,000 verdict against Stokes, and Stokes's administratrix[1] appealed to this Court, claiming that the trial court should have directed a verdict in Stokes's favor because, she argued, there was no credible evidence to support the verdict. Even *388 though this Court affirmed the judgment, this Court detailed the evidence, which was hotly contested, as shown by the opinion of this Court:
"On May 5, 1984, plaintiff Scott, Stanley Jackson, and six other men were riding motorcycles in Covington and Coffee Counties. They travelled from Enterprise to Opp and from Opp to Andalusia and then back to Opp. Between 3:00 p.m. and 4:00 p.m., the motorcyclists left Opp on Highway 84 heading east toward Elba. They were paired off, with Scott and Jackson riding together behind four other riders.
"The accident that is the basis of this lawsuit occurred six miles out of Opp. The evidence regarding how the accident occurred is conflicting. Scott's version of the accident is as follows:
"`At the time Eugene and his brother and Stackhouse and Smith, they were out of sight until I come into this curve. Just as I come into this curve I saw Stackhouse and Smith. Just as I saw them they were coming out and they got too close. Looked like they were going to hit. About that time I saw the car. I already saw the car coming up the road. It was a red Cordoba. By the time it got past Stackhouse and them it went off the edge of the road and come back across on my lane and hit me head on. Just before the car hit me, about from here to maybe the jury right there, my eyes just closed.'
"Scott and Jackson testified that they were travelling between 55 and 60 miles per hour. Stokes's testimony concerning the accident differs substantially from Scott's. Stokes testified that he was driving between 30 and 35 miles per hour when the motorcycle driven by Scott came around the curve at 75 to 80 miles per hour, and that Scott lost control and came into his lane of traffic, hitting his automobile.
"The point of impact was also contested in this case. Jackson and Scott both testified that the Stokes vehicle ran off the road and then into their lane of traffic. Bobby Smith, an automobile accident reconstruction expert, who investigated the accident for Scott, testified that the Stokes vehicle, in his opinion, crossed over into Scott's lane and that the point of impact occurred in Scott's lane. Stokes testified that Scott lost control of his motorcycle and crossed into his lane and that the impact occurred there. Two Alabama state troopers who investigated the accident shortly after it happened testified that the point of impact was in Stokes's lane of traffic....
"* * * *
"The first issue we address is whether there is credible evidence to sustain the verdict for Scott. Stokes's administratrix contends that there is not and that the verdict is contrary to the law, and the evidence. Specifically, she contends that the testimony of plaintiff's witness Stanley Jackson should be disregarded because it is unbelievable and inherently improbable and defies the laws of physics.
"As indicated earlier in this opinion, and as is shown by the appendices, there is sharp disagreement on the question of the point of impact. Also, there is substantial evidence from which the jury could have found that the plaintiff had been drinking and at the time of the accident was exceeding the speed limit and was in defendant's lane of traffic. Two law enforcement officers placed the point of impact in the defendant's lane. Plaintiff's witnesses placed the point of impact in the plaintiff's lane. While the testimony of plaintiff's witnesses regarding distances, and the events that occurred between those distances, would seem to be contrary to the basic law of physics, we are not convinced that the testimony is incompetent. The credibility of plaintiff's witnesses was for the jury to determine."
Hollis v. Scott, 516 So.2d 576, 577-78 (Ala. 1987) (emphasis added to last paragraph).
Stokes's administratrix filed the present suit, charging that State Farm was negligent and/or wanton in its failure to accept an offer to settle with Scott for the policy limits and for wanton failure to file a supersedeas *389 bond. The jury returned a verdict against State Farm for $1,500,000. State Farm brings this appeal.
While numerous issues are raised on appeal, because of our resolution of the case we address only three issues.

Negligent Failure to Settle
Simply put, this case presents the question of whether an insurer can be liable in tort for failing to settle a claim when the issue of liability is questionable and the amount of damages, if liability is found, will clearly exceed the policy limits.
"The question is asked in some of the authorities, `What would constitute negligence in the failure to settle a case as distinguished from bad faith?' 131 A.L.R. 1501. The answer is that it is a question for the jury from all the facts and circumstances to determine whether the failure on the part of the insurer to make settlement is an act of negligence or one of bad faith. Both of those terms have a well understood meaning, and we do not see any reason why we should stumble over their application. In this connection it is well to observe that the mere failure on the part of the insurer to make a settlement within the limits of his contract when he has an opportunity to do so is not alone evidence of negligence or bad faith.

"The allegation of negligence is made in one count of the complaint and bad faith in the other. In order to succeed it is necessary for the plaintiff to prove either negligence or bad faith. There is no presumption under the circumstances of this case of either negligence or bad faith. The principle of res ipsa loquitur has no application here and, therefore, the issue is simply made here as in all negligence cases whether, considering all the circumstances, the insurer failed to exercise ordinary care on the one hand or good faith on the other."
Waters v. American Casualty Co. of Reading, Pa., 261 Ala. 252, 258, 73 So.2d 524, 529 (1954). (Emphasis added.) On rehearing, the Court elaborated on the standards of liability:
"We have been urged to extend the opinion in this cause as to the application of the rules of negligence and bad faith and as to the effect of the opinion upon the liability of attorneys representing the insured upon appointment by the insurer. We first consider negligence and bad faith in cases of this nature.
"There is a field of operation for both aspects of liability: that is, negligence in one, and bad faith in the other. We cannot set aside the principle of liability for negligently performing a contract as set forth in the opinion supra. It may arise when an insurer is engaged in performing his contractual duty owing to the insured to defend the suit. The law raises a duty not contractual, but by reason of the contract, to exercise ordinary diligence in doing so. A failure to exercise ordinary diligence proximately causing damage to the insured is actionable in tort. The contract of insurance gives the insurer the exclusive right to make a settlement of the claim against insured. That right imposes a corresponding duty raised by law to observe ordinary diligence in performing that power, when in the exercise of it. So that, when an opportunity is presented to the insurer to make a settlement of the claim in an amount not more than the limit of liability, the law raises a duty on his part to use ordinary care to ascertain the facts on which its performance depends if he has not already done so. If the insurer neglects to exercise ordinary diligence in ascertaining these facts, if he has not already done so, and as a proximate result of such neglect he fails to make such a settlement, which is available, and when such knowledge would have caused a reasonably prudent person to do so and a verdict and judgment are rendered against insured in an amount more than the limit of liability in the policy, the insurer should be held liable to the insured for the full amount of the judgment.
"If the insurer has already made the investigation and ascertained the facts, to which we have referred supra, and refuses to make such proffered settlement, *390 if such refusal is due to the honest judgment of insurer that the facts do not warrant such a settlement, and the insurer was not negligent in the manner of defending the suit, he would not be liable to insured for an amount in excess of the limit of liability provided in the policy, although the verdict and judgment were in excess of it. But, if such refusal to settle under those circumstances is the proximate result of bad faith on the part of the insurer, he would be liable for the full amount of the judgment, notwithstanding it is in excess of the limit fixed in the policy."
Id., 261 Ala. at 260-61, 73 So.2d at 531-32. (Emphasis added.)
The Court reaffirmed the Waters criteria in Nationwide Mutual Insurance Co. v. Smith, 280 Ala. 343, 351, 194 So.2d 505, 512 (Ala.1966):
"And we ask, would not the refusal of an insurer, after diligent investigation of the facts, and having under the insurance contract exclusive control of the litigation and sole right of settlement, be negligent if under all the facts the offer of settlement was one which an ordinarily prudent person would accept under like or similar circumstances? And would not a refusal to settle under such circumstances negative in law a claimed exercise of `honest judgment,' and raise a question of fact for submission to a jury?
"In its extended opinion on rehearing in the Waters case, supra, the court made it clear it was not departing from the doctrines enunciated in its original opinion."
There is no allegation that State Farm was negligent in failing to ascertain facts necessary to make an informed decision about whether to settle. Therefore, the issue is whether State Farm exercised "honest judgment" in refusing to settle. In evaluating this contention, we must be careful to heed the admonishment in Waters that the fact that a verdict came back in excess of the policy limits is not, standing alone, evidence of negligence. To hold otherwise would require insurers to be prophets.
No one disputes the fact that liability was hotly contested. State Farm's insured insisted throughout the proceedings that he was not at fault, even though he did eventually request that State Farm settle the claim. Other evidence supported the defendant's claim. The facts that allegedly impugn State Farm's "honest judgment" argument is plaintiff's expert testimony. The plaintiff's experts testified that if liability were established, damages would be in excess of the policy limits and possibly far in excess of those limits. With respect to the defendant's contention on appeal that it was entitled to JNOV on the claims, the question is whether this expert testimony amounts to a scintilla of evidence of a lack of honest judgment or a lack of due diligence.
It has been suggested that an insurer in State Farm's position use the following guideline in considering a demand for settlement with its insured: "Would I accept this demand if the policy coverage were unlimited?" Annot., 63 A.L.R. 725, § 2[b] (1975). See also Dumas v. Hartford Accident & Indemnity Co., 94 N.H. 484, 56 A.2d 57 (1947); Betts v. Allstate Ins. Co., 154 Cal.App.3d 688, 201 Cal.Rptr. 528 (1984); 7C J. Appleman, Insurance Law and Practice, § 4713 (1979); Hartford Accident & Indemnity Co. v. Foster, 528 So.2d 255 (Miss.1988). With respect to a "good faith" standard of liability, a Pennsylvania superior court said in a case in a very similar posture:
"Appellant's mistake is its apparent belief that proof of sincerity is equivalent to proof of good faith. For purposes of disposition, we may assume that appellant's refusal to offer to settle was based on the sincere belief that Reed had not been negligent. The good faith standard requires more than proof of sincerity:
"`"[A] decision not to settle must be a thoroughly honest, intelligent and objective one. It must be a realistic one when tested by the necessarily assumed expertise of the company." [Bowers v. Camden Fire Ins. Assoc., 51 N.J. 62, 71, 237 A.2d 857, 861 (1968)]. This expertise must be applied, *391 in a given case, to a consideration of all the factors [emphasis in the original] bearing upon the advisability of a settlement for the protection of the insured. While the view of the carrier or its attorney as to liability is one important factor, a good faith evaluation requires more. [Emphasis added in Shearer.] It includes consideration of the anticipated range of a verdict, should it be adverse; the strengths and weaknesses of all of the evidence to be presented on either side so far as known; the history of the particular geographic area in cases of similar nature; and the relative appearance, persuasiveness, and likely appeal of the claimant, the insured, and the witnesses at trial. Garner v. Am. Mut. Lia. Ins. Co., 31 Cal.App.3d 843, 107 Cal.Rptr. 604, 607-608 (1973). Rova Farms Resort, Inc. v. Investors Insurance Company of America, 65 N.J. 474, 489-90, 323 A.2d 495, 503-04 (1974).'
"Here, the jury was entitled to find that even assuming the sincerity of appellant's representatives, their appraisal of the case was not either intelligent or objective, and their refusal to offer to settle, therefore, was not in good faith. Given appellee's injuries, it was obvious that any verdict in her favor would exceed the policy limit. It was therefore especially critical to appraise the likelihood of such a verdict. In making that appraisal, one could anticipate that aif not theprincipal issue at trial would be the degree of visibility, that is to say, considering the fog, was Reed driving too fast? Appellant knew that there would be conflicting testimony on this point. Appellant further knew that appellee would present an appealing sight to the jurya middle-aged woman, visibly and permanently injured, clearly through no fault of her own. One could further anticipate, therefore, that the jury might very well resolve conflicts in the testimony in appellee's favor. Confronted with such a case, the intelligent and objective claims adjuster does not refuse to offer to settle. Or so the jury was entitled to conclude. The fact, so emphasized by appellant, that the trial judge evidently would have concluded otherwise is immaterial, as the judge recognized in his opinion refusing to grant appellant's motion for judgment n.o.v. The jury having reached its verdict, the court's duty is not to ask whether it would have reached the same verdict but whether the verdict is in accordance with law and supported by the evidence, as the jury could have regarded that evidence. Brown v. Shirks Motor Express, 393 Pa. 367, 143 A.2d 374 (1958)."
Shearer v. Reed, 286 Pa.Super. 188, 428 A.2d 635, 638-39 (1981). While the Pennsylvania standard is one of good faith and Alabama's is negligence, the criteria set forth in Shearer are useful in determining whether the insurer was negligent.[2]
"If there is some probability of harm sufficiently serious that ordinary men would take precaution to avoid it, then failure to do so is negligence." Dumas, 94 N.H. at 489, 56 A.2d at 60. In Dumas the facts showed the question of liability to be close, but the severity of injury to be great. The court affirmed a judgment based on a verdict for the insured. The Mississippi Supreme Court in Foster supra, recognized that tort liability can exist in the context of a failure to settle a claim, saying, "[T]he *392 insurer has a fiduciary duty to look after the insured's interest at least to the same extent as its own, and to make a knowledgeable, honest and intelligent evaluation of the claim commensurate with its ability to do so. If the carrier fails to do this, then it is liable to the insured for all damages occasioned thereby." 528 So.2d at 265. The court then held that the insured's claim must fall because the insured was guilty of neither negligence nor bad faith in handling the settlement. The court stated that the claimant's only "asset" in the underlying tort action "was the dreadful injury to his arm." In an appendix to the opinion the court characterized the evidence as showing that it was "highly unlikely" that the insured was on the wrong side of the road.
Unlike in Foster, here the claimant's case did not hinge solely on his testimony and severe injuries. The only eyewitness other than the parties stated that the insured was at fault. In addition, the claimant's accident reconstruction expert placed the insured's car in the claimant's lane of traffic. While we recognized that the expert's testimony was highly suspect, we nonetheless deemed it not incompetent. Hollis v. Scott, 516 So.2d 576 (Ala.1987).
The insured in this case put on expert witnesses, two of whom said that there was a reasonable probability that a verdict for the plaintiff in excess of the policy limits would be returned. In light of the above, a jury question was presented on the issue of negligence.

Wanton Failure to Settle
In Waters we recognized causes of action for negligence or bad faith in not settling a claim. We acknowledged in Waters that bad faith, in essence, was the intentional failure to settle a claim. We have not had occasion to determine whether a cause of action for wantonness is viable. Assuming, without deciding, that a wantonness claim is viable, after a careful review of the record, we find no evidence to support that claim. Therefore it was error to submit that claim to the jury.

Wanton Failure to File a Supersedeas Bond
Finally, the defendant claims the trial court erred in submitting to the jury the claim set out in count two of the complaint, that the insurer wantonly breached a duty to file a supersedeas bond while the first appeal was pending. The parties agree that there was no contractual duty to file a supersedeas bond. The insured claims, however, that because of the insurer's wrongful conduct in not settling the claim and in appealing the judgment based on the jury verdict, it undertook a duty to protect the insured and wantonly failed to do so. He cites the following from Farmers Insurance Exchange v. Henderson, 82 Ariz. 335, 313 P.2d 404 (1957), in support of that proposition.
"In the event good faith obliges the company to terminate the litigation by settlement, its failure to do so renders it liable as between the insured and insurer for the full amount of the judgment.... The company cannot be allowed to require Henderson to pay or supersede a judgment which it wrongfully imposed upon him. It could not seek shelter under this provision of the contract when its wrong created the necessity for supersedeas. The company would have no right under such conditions to require Henderson to pay protection. If it wrongfully created the situation, the company must protect Henderson if it desires to appeal. This question should be presented to the jury in harmony with these principles."
82 Ariz. at 341, 313 P.2d at 408. The only claim the court considered in Henderson was the claim of a wrongful failure to settle. The discussion the insured points to arose in the context of deciding whether the insured had a viable cause of action for failure to settle until such time as he paid the underlying judgment.[3] The court noted *393 authority to the contrary, but rejected the position that there was no cause of action, because the insured was subject to levy and execution while the case was on appeal and had therefore been injured.
Henderson presented a somewhat novel factual circumstance. The insured was found liable at trial. The insurer took an appeal and did not file a supersedeas. While the case was on appeal, the judgment creditor executed the judgment and had the insured's property sold. The original judgment was then reversed. The insured alleged that the insurer had wrongfully refused to settle the claim. However, because the original judgment in excess of the policy limits was vacated, the only damage plaintiff suffered flowed from the execution on the judgment.
After a lengthy discussion of the status of the law of wrongful failure to settle in Arizona, the central issue was what, if any, liability the insurer had as a result of the execution. The insurer argued it had no liability because the insurance contract specifically said that it did not have to secure a supersedeas bond. The court agreed that no contractual liability existed, but said that the contract did not create a bar to liability where its tortious conduct in failing to settle led to execution on the insured's property. The court held that the loss brought about by the execution was a recoverable element of damages in the failure-to-settle claim, but held that the claim of damages for humiliation, mental pain, suffering, and anguish incurred by the Hendersons as a result of the execution was not recoverable.[4]
Thus, contrary to our plaintiff's assertion, Henderson does not stand for the proposition that a separate cause of action exists for failure to file a supersedeas bond, but rather for the proposition that injury as a consequence of the execution of the underlying judgment was a recoverable element of damages for the wrongful-failure-to-settle claim. We agree that any loss brought about by execution of the judgment would be recoverable in damages. It is a loss that logically flows from the failure to settle. However, just as in any tort action, every element of damages does not give rise to a separate cause of action. An automobile accident may create liability for losses, including hospital bills, caused by the wrongful conduct of the defendant in causing the accident, but the failure of the defendant to promptly pay the hospital bills does not give rise to a separate cause of action for wrongful failure to pay hospital bills.
We have found no other authority to support recognizing such a claim as a separate cause of action under facts such as these. Therefore, the trial court erred in submitting to the jury the separate claim for wanton-failure-to-file a supersedeas bond to the jury.
Because the trial court erred in submitting the wanton-failure-to-settle claim and the wanton-failure-to-file-supersedeas claim to the jury over the defendant's specific objections, the general verdict cannot stand. King Mines Resort, Inc. v. Malachi Mining & Minerals, Inc., 518 So.2d 714 (Ala.1987). Therefore, a new trial on the negligent-failure-to-settle claim is required.
REVERSED AND REMANDED.
HORNSBY, C.J., and JONES, ALMON, SHORES and KENNEDY, JJ., concur.
ADAMS, J., concurs specially.
MADDOX and STEAGALL, JJ., concur in part and dissent in part.
ADAMS, Justice (concurring specially).
See my comments in Porter v. Hook, 554 So.2d 382 (Ala.1989). Under the appropriate factual situation after retrial, a similar utilization of Reynolds v. First Alabama Bank, 471 So.2d 1238 (Ala.1985), could be had.
*394 MADDOX, Justice (concurring, in part; dissenting, in part).
I concur in that part of the opinion that holds it was error to submit to the jury the claims for wanton failure to settle and wanton failure to file a supersedeas. I dissent from that portion holding that a jury question was presented on the issue of negligent failure to settle, based upon the facts of this case. The evidence in this case clearly shows that State Farm was warranted in refusing to settle; consequently, I would not grant the plaintiff a right to try that issue again.
This case presents a classic example of an insured who does not carry enough insurance, and who, although stoutly denying that he was liable for the accident, and although his own independent counsel was of the opinion that the case could be won, now claims that his insurer should be liable to him for failing to accept the plaintiff's offer of settlement.[5] The only asset that the insured had in regard to his claim against his insurer was the seriousness of the original plaintiff's injuries, as is clearly shown by the opinion of this Court, which affirmed a judgment for the plaintiff in the original action, which State Farm defended. Hollis v. Scott, 516 So.2d 576 (Ala.1987). In that case, this Court, Maddox, J., writing for the Court, affirmed the judgment, but, as that opinion shows, the Court stated that the plaintiff's evidence "seemed contrary to the law of physics." In that case, the Court stated the following:
"On May 5, 1984, plaintiff Scott, Stanley Jackson, and six other men were riding motorcycles in Covington and Coffee Counties. They travelled from Enterprise to Opp and from Opp to Andalusia and then back to Opp. Between 3:00 p.m. and 4:00 p.m., the motorcyclists left Opp on Highway 84 heading east toward Elba. They were paired off, with Scott and Jackson riding together behind four other riders.
"The accident that is the basis of this lawsuit occurred six miles out of Opp. The evidence regarding how the accident occurred is conflicting. Scott's version of the accident is as follows:
"`At the time Eugene and his brother and Stackhouse and Smith, they were out of sight until I come into this curve. Just as I come into this curve I saw Stackhouse and Smith. Just as I saw them they were coming out and they got too close. Looked like they were going to hit. About that time I saw the car. I already saw the car coming up the road. It was a red Cordoba. By the time it got past Stackhouse and then it went off the edge of the road and come back across on my lane and hit me head on. Just before the car hit me, about from here to maybe the jury right there, my eyes just closed.'
"Scott and Jackson testified that they were travelling between 55 and 60 miles per hour. Stokes's testimony concerning the accident differs substantially from Scott's. Stokes testified that he was driving between 30 and 35 miles per hour when the motorcycle driven by Scott came around the curve at 75 to 80 miles per hour, and that Scott lost control and came into his lane of traffic, hitting his automobile.
"The point of impact was also contested in this case. Jackson and Scott both testified that the Stokes vehicle ran off the road and then into their lane of traffic. Bobby Smith, an automobile accident reconstruction expert, who investigated the accident for Scott, testified that the Stokes vehicle, in his opinion, crossed over into Scott's lane and that *395 the point of impact occurred in Scott's lane. Stokes testified that Scott lost control of his motorcycle and crossed into his lane and that the impact occurred there. Two Alabama state troopers who investigated the accident shortly after it happened testified that the point of impact was in Stokes's lane of traffic....
"* * * *
"The first issue we address is whether there is credible evidence to sustain the verdict for Scott. Stokes's administratrix contends that there is not and that the verdict is contrary to the law, and the evidence. Specifically, she contends that the testimony of plaintiff's witness Stanley Jackson should be disregarded because it is unbelievable and inherently improbable and defies the laws of physics.
"As indicated earlier in this opinion, and as is shown by the appendices, there is sharp disagreement on the question of the point of impact. Also, there is substantial evidence from which the jury could have found that the plaintiff had been drinking and at the time of the accident was exceeding the speed limit and was in defendant's lane of traffic. Two law enforcement officers placed the point of impact in the defendant's lane. Plaintiff's witnesses placed the point of impact in the plaintiff's lane. While the testimony of plaintiff's witnesses regarding distances, and the events that occurred between those distances, would seem to be contrary to the basic law of physics, we are not convinced that the testimony is incompetent. The credibility of plaintiff's witnesses was for the jury to determine."
Hollis v. Scott, 516 So.2d 576, 577-78 (Ala. 1987) (emphasis added to last paragraph).
In discussing the duty of an insurer to settle a case, the majority cites Shearer v. Reed, 286 Pa.Super. 188, 428 A.2d 635 (1981), and concludes that Alabama's "negligence" test is the same as the "bad faith" test, and then quotes the "good faith" standard, as follows:
"[A] decision not to settle must be a thoroughly honest, intelligent and objective one. It must be a realistic one when tested by the necessarily assumed expertise of the company. [Bowers v. Camden Fire Ins. Assoc., 51 N.J. 62, 71, 237 A.2d 857, 861 (1968)]. This expertise must be applied, in a given case, to a consideration of all the factors [emphasis in the original] bearing upon the advisability of a settlement for the protection of the insured. While the view of the carrier or its attorney as to liability is one important factor, a good faith evaluation requires more. [Emphasis added in Shearer.] It includes consideration of the anticipated range of a verdict, should it be adverse; the strengths and weaknesses of all of the evidence to be presented on either side so far as known; the history of the particular geographic area in cases of similar nature; and the relative appearance, persuasiveness, and likely appeal of the claimant, the insured, and the witnesses at trial. Garner v. Am. Mut. Lia. Ins. Co., 31 Cal.App.3d 843, 107 Cal.Rptr. 604, 607 (1973)."
Even applying that standard to the facts of this case, I conclude that State Farm should have been entitled to a directed verdict.
The view of the carrier or its attorney as to liability. A "good faith" evaluation of a claim requires more than the assessment of potential liability made by the carrier and its attorney, and there was more in this case. The insured's own independent counsel was of the opinion that there was no liability.
Anticipated range of the verdict, if adverse. While there was sufficient evidence that the plaintiff's injuries were such that a verdict in excess of $25,000 would probably result if liability was established, there were other factors in this case that would indicate that an adverse verdict should not have been anticipated.
The strengths and weaknesses of the evidence on both sides. Clearly, Stokes's evidence of no liability was much stronger. In fact, it was almost overwhelming. On the other hand, Scott's evidence was weak. This Court, in assessing Scott's evidence on the original appeal, stated that "the testimony *396 of plaintiff's witnesses regarding distances, and the events that occurred in those distances, would seem to be contrary to the basic law of physics." Two state troopers testified that the point of impact occurred on Stokes's side of the road, just as Stokes testified.
The history of the particular geographic area in cases of similar nature; and the relative appearance, persuasiveness, and likely appeal of the claimant, the insured, and the witnesses at trial. The accident happened in Covington County, a rural county. Stokes was a resident of the area. His brother, who also represented him along with State Farm's counsel, was an outstanding member of the Coffee County Bar and a former member of the Alabama Legislature; there was evidence that plaintiff Scott was a member of a group of several motorcyclists who had been drinking in Andalusia shortly before the accident occurred; Scott himself testified that he was travelling 55 to 60 miles per hour (Stokes claimed Scott was travelling 75 to 80 miles per hour at the time). In other words, there was evidence that Scott was speeding at the time of the accident. Why did State Farm not have a right to assume that any jury in that county, faced with those conflicting versions and with testimony that even this Court almost did not believe credible, would return a verdict of $1,000,000 in the case? Why did State Farm not have a right to assume a jury would believe Stokes and the two state troopers?
This Court, in Waters v. American Cas. Co. of Reading, Pa., 261 Ala. 252, 73 So.2d 524 (1954), formulated an "honest judgment" test, which specifically exempted insurers from liability where "such refusal is due to the honest judgment of [the] insurer that the facts do not warrant such a settlement." I believe that this is just such a case.
This case bears a striking resemblance to Hartford Accident & Indem. Co. v. Foster, 528 So.2d 255 (Miss.1988), in which the Mississippi Supreme Court reversed a judgment based on a verdict against Hartford for bad faith failure to settle and rendered judgment for the insurer. The facts are so similar to those involved here that they merit more than cursory discussion.
While driving a pickup truck on a country road, Donald Harris, an insured of Hartford, was involved in an accident with James Sims. The vehicles sideswiped each other. Sims sustained severe injury to his left arm. Suit was filed by Sims claiming $150,000 in actual damages and $150,000 in punitive damages. Harris's liability policy with Hartford had maximum limits of $50,000.
The attorney retained by Hartford personally inspected the scene and interviewed prospective witnesses. Counsel opined that there was no liability, although there would be a jury issue presented. Each driver contended that the accident occurred on his side of the road. The investigating officers testified that the debris indicated that the point of impact was about a foot and a half inside Harris's side of the road. One testified that he smelled alcohol on Sims's breath. Sims's friend, who arrived at the scene shortly after the accident, testified that the Harris pickup was in the middle of the road.
On the day of trial, Sims's attorney offered to settle for $45,000. The insured, while expressing the opinion that there was no liability, requested that the case be settled. Hartford rejected the offer, as well as subsequent offers of $35,000 and $30,000. Hartford offered $25,000, which was rejected. Counsel testified that he recommended that Hartford offer $25,000 only because of his concern that the insured could be personally at risk should the plaintiff get a verdict. He repeatedly affirmed his conviction that there was no liability.
The trial resulted in an $80,000 verdict. Hartford then offered its policy limits, but that offer was rejected. The case was appealed, and the judgment was affirmed, without an opinion. The subsequent suit against Hartford and the attorneys resulted in a $30,000 verdict against the defendants for bad faith failure to settle within policy limits and for breach of fiduciary duty owed by the attorneys. 528 So.2d at 257-61.
*397 After quoting extensively from case authority concerning the obligation of an insurer when an offer of settlement is made within policy limits, the court adopted the prevailing view. Under that view, the fiduciary duty requires an insurer to consider the insured's interest at least to the same extent as its own and to make a knowledgeable, honest, and intelligent evaluation of the claim. The court then determined:
"The fact remains that there is nothing in this case supporting bad faith on the part of Hartford's decision not to accept the offer of settlement. There can be no negligence or bad faith attributed to Hartford's assessment of the settlement value of this case. Hartford made a realistic evaluation. The only asset of Sims' case was the dreadful injury to his arm. No insurance company should be faulted, however, regardless of the plaintiff's injuries, for not paying a claim when it has every reason to believe its insured was not at fault. In so doing it may upon occasion lose (as Hartford did here), but this is a far more salutary practice than encouraging insurance companies to pay off every dubious claim in which the injuries happen to be serious. Of course, a serious question of liability coupled with serious injuries is an entirely different matter. This is certainly not the case."
528 So.2d at 266 (emphasis added).
Particularly interesting is the Mississippi court's comment that for the accident to have happened as Sims described it "would have violated a basic law of physics." 528 So.2d at 276. This Court used similar language in Hollis v. Scott, when this Court stated, "While the testimony of plaintiff's witnesses regarding distances, and the events that occurred between those distances, would seem to be contrary to the basic law of physics, we are not convinced that the testimony is incompetent." 516 So.2d at 578. The only conclusion that can be reached from a reading of the Hollis v. Scott opinion is that this Court almost reversed that case. How can State Farm be faulted, then, for defending a case this Court thought was so weak? I do not think it can or should be, and, as I suggest in footnote 5, if Stokes wanted to protect his assets against the possibility of a judgment, why did he not buy the release? The $25,000 may have represented the sum of premiums for $1,000,000 coverage over the life of the policy. I would follow the example set by the Mississippi Supreme Court. Both this case and Foster involved questionable liability claims against an insured. In both cases, the insured's position of no liability was supported by the physical evidence and the testimony of the investigating officers as to where the impact occurred. In both cases, able trial counsel, after proper and adequate preparation, concluded that the case could be successfully defended, and in this case the insured's own counsel was of that opinion.
The record in Hollis and the record in this case show that Stokes steadfastly denied liability throughout pre-trial proceedings and throughout the trial. The experienced local attorney State Farm hired to represent Stokes advised State Farm that the suit could be won. Although Stokes's brother, who Stokes independently hired as his personal attorney, requested that State Farm settle the case, he also gave his opinion that the case could be won. As the Mississippi Supreme Court said in Foster, "[n]o insurance company should be faulted,... regardless of the plaintiff's injuries, for not paying a claim when it has every reason to believe its insured was not at fault." 528 So.2d at 266.
Based on the foregoing, I would reverse the judgment on the negligent-failure-to-settle claim and render judgment for State Farm on that claim; therefore, I dissent as to the majority's holding regarding that claim.
STEAGALL, J., concurs.
NOTES
[1] Mr. Stokes died during the pendency of the original appeal and his administratrix, Mary Nell Hollis, was properly substituted. Ms. Hollis filed the present suit.
[2] "`[I]t should be pointed out that there is more of a difference in verbiage than there is in result in the cases.... Some courts, in weighing the responsibilities of the liability insurer, speak of bad faith; some speak of negligence; others use the two terms interchangeably. The insurer, as a professional defender of lawsuits, is held to a standard higher than that of an unskilled practitioner. What might be ignorance in one instance may be unforgivable oversight of the insurer; what might be neglect in one instance could well constitute bad faith on the part of the insurer. The question is always: Did the insurer exercise that degree of skill, judgment, and consideration for the welfare of the insured which it, as a skilled professional defender of lawsuits having sole charge of the investigation, settlement, and trial of the suit may have been expected to utilize?'"

Appleman at § 4712. Of course, a finding of negligence alone would not warrant an award of punitive damages, whereas a finding of bad faith would.
[3] In Alabama, the cause of action under similar circumstances does not accrue until the judgment is affirmed on appeal. Hartford Accident & Indemnity Co. v. Cosby, 277 Ala. 596, 173 So.2d 585 (1965). An action by the judgment creditor under Code 1975, § 27-23-2, against the insurer does mature prior to disposition on appeal if no supersedeas is filed. Ohio Casualty Ins. Co. v. Gantt, 256 Ala. 262, 54 So.2d 595 (1951).
[4] The only injury claimed in this case is emotional distress.
[5] I recognize that the insured's brother recommended that State Farm accept plaintiff's offer of settlement, but if Stokes's own counsel thought it economically wise to settle for $25,000 so as to protect Stokes's assets against execution on a judgment for a higher sum, why did Stokes' counsel not advise his client to pay the $25,000 and then litigate the issue of State Farm's liability to repay the $25,000 in a separate proceeding? In other words, the opinion that the case could be won on the question of liability was not that of State Farm's lawyer alone, but also that of Stokes's own independent counsel, who, incidentally, was his brother. Why should an insurer be so responsible to protect the assets of its insured when its insured thought it unnecessary to pay a higher premium and obtain higher coverage?