[No. C030059. Third Dist. Dec. 20, 2002.]

GEORGE F. HILLENBRAND, INC., et al., Plaintiffs and Appellants, v. INSURANCE COMPANY OF NORTH AMERICA et al., Defendants and Appellants.

**COUNSEL**

Law Offices of Robert W. Drane, Robert W. Drane; Sack, Miller & Rosendin and William S. Miller for Plaintiffs and Appellants.

Hinshaw & Culbertson, Robert J. Romero, Paul E. Vallone and Michelle S. Dangler for Defendants and Appellants.

**OPINION**

**RAYE, J.**—A jury found that Aetna Insurance Company maliciously prosecuted two lawsuits against the insureds, George F. Hillenbrand, a framer, and his company, George F. Hillenbrand, Inc. The Insurance Company of North America (INA) handled the investigation and processing of the claim,

as well as the prosecution of the lawsuits against Hillenbrand, but the trial court granted INA's motion for a directed verdict, concluding it was not liable as an agent for the insurer pursuant to section 2351 of the Civil Code.[1] Based on evidence the insurer prosecuted the lawsuits despite its knowledge of facts triggering potential coverage and a duty to defend, and of the law prohibiting an insurer from suing its insured during the pendency of the underlying claim, the jury awarded Hillenbrand punitive damages. Hillenbrand accepted the trial court's remittitur of the award. Aetna appeals the judgment for compensatory and punitive damages. Hillenbrand appeals the judgment on a directed verdict in favor of INA and cross-appeals the reduction of punitive damages.

The insurer justifies the prosecution of the two lawsuits against its insured as routine advocacy and sound economics. The jury and several trial judges rejected the insurer's conservative notion of its duty to defend and its expansive notion of its right to fight its own insured. We conclude there is substantial evidence to support the jury's findings. We therefore affirm the judgment for the compensatory and punitive damages and find no abuse of discretion in the reduction of the punitive damages. We reverse, however, the judgment in favor of INA, having concluded that Civil Code section 2351 does not allow a corporation to exonerate itself from liability as an agent by delegating its obligations to its own employees.

## FACTS

In 1973 Hillenbrand did the framing, subfloors and decking, and installed siding on various condominium units as one of several subcontractors for Ring Brothers Corporation and Dalehurst Comstock Corporation (Ring Brothers), the general contractor for the Crosswoods condominium project in Citrus Heights. Although the siding needed to be painted or sealed to protect it from delaminating and warping, Hillenbrand was not responsible for that work, nor was it responsible for the necessary periodic repainting or resealing of the siding.

---

[1]During the protracted passage of this case through the legal system, the insurer's name has changed several times, and therefore, designation of the parties in the briefs is confusing. Aetna apparently was renamed CIGNA Property & Casualty Insurance Company in 1987 and ACE Property and Casualty Insurance Company in 1999. Aetna engaged INA to adjust the claim, and throughout the first few years of the litigation, Aetna and INA were named together as the parties prosecuting or defending the actions (Aetna/INA). When their interests are aligned, that is, when INA was acting solely as Aetna's and later as CIGNA and ACE's agent, we refer to them collectively as the insurer. On occasion, we identify Aetna or INA to clarify their individual actions. At all times, these various entities were represented by the same lawyers. We refer to George F. Hillenbrand, the individual, and his corporation, George F. Hillenbrand, Inc., as Hillenbrand.

In 1981 Crosswoods Homeowner Association sued Ring Brothers for negligent construction. Hillenbrand knew nothing of the lawsuit. It was not notified of any defects in its work. Customarily, it remedied any alleged problems; as a consequence, it had never been sued. In 1982 George Hillenbrand was named Builder of the Year by the Building Industry Association, the same year he served as president of that organization. The award was particularly meaningful because he was the first president of the association who "had ever come up from a carpenter."

In August 1982 Ring Brothers demanded that Hillenbrand defend and indemnify it, pursuant to its subcontract, for all damages resulting from the services it performed on the Crosswoods project. Hillenbrand immediately notified its insurer, Aetna, but after an initial contact with G. John Palmer, a claims supervisor, Aetna made no further contact until late 1983. Meanwhile, Aetna sent the claim to INA for assistance in investigation and handling. The claim was assigned to the claims unit manager in the Sacramento regional office, Michael Cerf. Throughout his involvement with the claim, Cerf reported to home office supervisors Perry Huntington and Jane Joiner.

On June 30, 1983, Ring Brothers cross-complained against Hillenbrand and other subcontractors for indemnity and contribution, alleging that the homeowners' alleged damages were caused by Hillenbrand's and the other subcontractors' "fail[ure] . . . to perform their work on Crosswoods . . . in a workmanlike manner" and "[furnishing of] all . . . materials . . . for the . . . siding" in a "negligent" manner. The insurer later admitted that Ring Brothers's amended complaint alleged potential damage to property other than Hillenbrand's work product as a result of Hillenbrand's work on the siding. Hillenbrand tendered the cross-complaint to Aetna under two separate broad form comprehensive general liability (CGL) insurance policies.

Aetna's CGL policies provided for the following coverage: "[Aetna] will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of [¶] . . . property damage [¶] to which this insurance applies, caused by an occurrence, and [Aetna] shall have the right and duty to defend any suit against the insured seeking damages on account of such . . . property damage, even if any of the allegations of the suit are groundless, false or fraudulent . . . . [¶] . . . [¶] '[O]ccurrence' means an accident, including continuous or repeated exposure to conditions, which results in . . . property damage neither expected nor intended from the standpoint of the insured[.]" The policies did not apply "to that particular part of any property, not on premises owned by or

rented to the insured, [¶] . . . [¶] . . . the restoration, repair or replacement of which has been made or is necessary by reason of faulty workmanship thereon by or on behalf of the insured[.]"

The policies, therefore, covered: (1) damage to the siding if it was due to some cause other than Hillenbrand's own faulty workmanship, such as improper maintenance by others, defective materials, or design; and (2) damage to property other than the siding caused by Hillenbrand's faulty workmanship.

Aetna agreed to defend Hillenbrand, but only under a full reservation of rights, citing the faulty workmanship exclusion in its CGL policies. Aetna hired the law firm of Porter, Scott, Weiberg & Delehant to represent Hillenbrand.

Attorney Russell G. Porter advised Cerf that he had reviewed an April 1982 report from Scott Whitten, Inc., wherein Whitten concluded the major siding problem was buckling and loose siding sheets. Anthony S. Warburg, another lawyer from the Porter firm, advised Cerf in March 1984 that George Hillenbrand had driven through the project and concluded: "[T]he great majority of the present complaints concerning the siding (were) the result of poor maintenance as opposed to faulty workmanship. Apparently the units have never been repainted and this type of plywood siding needs to be repainted periodically to protect it from water intrusion and weathering."

Again, in April 1984, Warburg reported to Cerf that the siding problems were due to poor maintenance and not to faulty workmanship. "Discussions at our meeting evinced three major problems with the project, namely, improper tile decking, improper roofing, and improper siding. The siding problems break down into three areas, including, warping, improper nailing and improper backing. Also, some of the Z-bar flashing is missing which has caused interior water damage to some of the units. Although approximately 80 units have siding problems, we do not know which units in which phase have the particular problems mentioned above. Also, of the problems mentioned, we are uncertain which were caused by improper installation, improper maintenance, or both."

On June 11, 1984, Warburg told Cerf that the homeowner association's experts estimated it would cost $963,140 to fix the defective siding work. But Cerf considered the insured's exposure grossly inflated, as he explained in his deposition testimony: "Well, in this type of litigation, construction defect litigation, the experts are always real high up in that range, where in reality, what happens in these cases is they settle for cents on the dollar in

the long run. The carriers are aware of that. At the time you get to the settlement conference a nine hundred thousand dollar demand is settled for 25 thousand bucks so everybody knows that." On June 13, Cerf wrote to Hillenbrand, informing it that Aetna had no duty to defend because there was no potential coverage under the policy, and consequently, Aetna continued to assert its reservation of rights. Cerf told Warburg that Aetna/INA's "primary concern [was] effective management of the [litigation] expenses."

Cerf provided the INA home office an extensive report on the Hillenbrand litigation on July 9, 1984, concluding that it was not necessary to refer the case to outside counsel for a legal opinion as to coverage. He recommended INA not to file a declaratory relief action and sent the actual file and all original documents to the home office. He did not, however, mention either the potential maintenance problems or the potential damage to other property from the defective siding.

Within three weeks, Cerf changed his mind. On July 23 he warned Hillenbrand that "it may be necessary" to file a declaratory relief action to obtain a judicial determination whether INA/Aetna was obligated to indemnify it in the Crosswoods action. Because INA/Aetna would seek reimbursement of defense costs, Cerf advised Hillenbrand to hire its own lawyer to defend the declaratory relief action. It was not until the following day that he inquired about Hillenbrand's actual involvement in the construction project.

In August, Warburg apprised Cerf that his investigation of the causes of the damages to the condominium units was incomplete. He was particularly interested in the slope discrepancies on the second floor decking, which might have been due to design defects rather than faulty workmanship. The insurer also knew about water damage to wallboard and insulation not installed by Hillenbrand ("other property") caused by missing Z-bar flashing.

Nevertheless, in September Cerf asked the superintendent of the home office claims department for permission to file a declaratory relief action, despite his belief that INA had a duty to defend. He wrote: "[I]t is my recommendation that we join with Transamerica Insurance Services on this case, retain outside counsel to represent both carriers and file a Declaratory Relief immediately. The Declaratory Relief, in my estimation, will not resolve the case completely, but it will in fact resolve the damages that the carrier is responsible for. I would distinctly feel that we will not come away from this case without an obligation to defend the insured."

David Mackenroth and Claudia Robinson, representing INA/Aetna, filed the declaratory relief action against Hillenbrand in October 1984. A month

later, Warburg informed Cerf that INA/Aetna's expert had conducted a site inspection and it was his expert opinion that much of the damage, which Ring Brothers claimed was due to Hillenbrand's defective workmanship, was in fact caused by poor maintenance of the siding panels. Moreover, according to the same expert, the type of material used for the siding itself might have been defective. Hillenbrand did not supply the materials it installed in the Crosswoods development.

Hillenbrand was represented by Warburg in the underlying construction litigation. Warburg, paid by the insurer, reported to Cerf. At the same time, Hillenbrand was represented by Alvin R. Wohl and Steven B. Eggleston in the declaratory relief action filed against it by its own insurer. George Hillenbrand was baffled, frustrated, and depressed. At trial, Eggleston explained: "[Hillenbrand] didn't understand—as he explained it to me, he did not understand why it is that he was being sued by the very insurance company that he had paid to provide him protection if he got sued. [¶] And he was concerned about how he was going to—he expressed his concern about how he was going to be able to financially defend against that insurance company. He also expressed his concern about them having a conflict of interest. How could they protect him on the one hand while at the same time they were suing him. And he expressed his concern about all the confidential things he had been telling his former attorney, for example, Mr. Warburg and just in general how all this was going to be kept separated. And how it wasn't going to be—whether it was going to be used against him by INA, Aetna."

George Hillenbrand's concerns were well founded. In March 1985 the insurer asked Hillenbrand to admit that the damage to the condominium units arose "from deficiencies and/or defects in workmanship." Eggleston explained the untenable position his client was then in. As he told George Hillenbrand, "[F]irst of all, if you answer these interrogatories, what's going to happen is you're going to create a record which does two things. One, it will—if you answer them in a certain way, it will be an admission that you did something wrong at the Crosswoods action. And it will then become a record, and the attorneys for Crosswoods will be able to get that information and use it against you in the underlying case. [¶] Secondly, the way these are written by answering the questions on faulty workmanship, you give answers that will hurt you and will cause the insurance company to deny coverage because they're not going to cover that. So if you respond to these, you run the risk of both by confessing to do [sic] doing something wrong [in] your underlying case and at the same time eliminating all the insurance coverage for what you just confessed was there. [¶] That was the risk you ran

depending on what was happening, what the correct answers were. So what I told him was that we were in a very, very, very difficult spot. . . . [¶] . . . [¶] . . . So it's sort of like—I was explaining to him it was sort of like being shot by your own people behind the lines as you're trying to fend off the other side."

Shortly after the requests for admissions were sent to Hillenbrand, David Pritchett replaced Cerf. In October 1985 Robinson reported to Pritchett that one of the experts for the Crosswoods project testified at his deposition that some of the siding installed by Hillenbrand appeared to be defective. She also told Pritchett that two experts confirmed at their depositions that there was water damage due to leakage after the siding buckled and pulled away and that there was evidence the damage was due to maintenance problems. The same month, she reported to Pritchett that there was evidence the pooling of water on approximately 78 tile balconies was the result of inaccurate slope design. In November, Eggleston also informed Pritchett that the failure to paint the siding after it was installed and to properly maintain the siding after the project was completed caused the siding problems.

In response to interrogatories propounded by Hillenbrand, the insurer stated: "[T]he reports and investigation of CIGNA received prior to the institution of the Declaratory Relief Action showed that the insured may not have been responsible for various damage claims being alleged by the homeowners, and that such damages may have been due to the negligence of other contractors or of the association in failing to properly maintain the complex."

Nevertheless, in January 1986 Pritchett instructed Robinson to file a motion for summary judgment in the declaratory relief action before any settlement conference in the Crosswoods action. Hillenbrand's lawyer reminded Pritchett of the evidence giving rise to potential coverage and emphasized the applicability of the analogous case, *Economy Lumber Co. v. Insurance Co. of North America* (1984) 157 Cal.App.3d 641 [204 Cal.Rptr. 135]. At the same time, the insurer challenged first party claims from Crosswoods condominium owners, asserting that the homeowners did not properly maintain the property.

In March, Judge Roger K. Warren initially granted the motion for summary judgment, but on reconsideration he denied the motion. Before the motion had been reconsidered and denied, Robinson warned Pritchett the decision might be reversed. She wrote: "This situation is made more complicated by the fact that a recent decision on insurance coverage was not

cited by Hillenbrand's counsel and has not been spotted by Judge Warren. That is the case of Cal Farm Insurance Company v. TAC Exterminators, Inc. [(1985)] at 172 Cal.App.3d 564 [218 Cal.Rptr. 407]. I am sending you a full copy of the opinion should you wish to review it. [¶] . . . [¶] . . . Should either Judge Warren or Steve Eggleston pick up on the TAC case, it may be that our motion will be denied. In any event, the presence of that case in the books adds strength to the insured's position and increases the chances that if we win in the Superior Court, we will be reversed on appeal."

Judge Warren ultimately denied the motion for summary judgment because he discovered that Hillenbrand had presented evidence of "other property." Robinson explained to Pritchett: "At the hearing on the motion to reconsider, Judge Warren indicated that he had gone back over materials submitted to the court on April 14, 1986 by Wohl's office and had concluded that those papers may have established damage to 'other property' that is validly claimed in the underlying action. He specifically referenced cracked tiles, damage to insulation, and damage to sheetrock." Nevertheless, the insurer continued to prosecute its lawsuit against its insured and thereafter filed a second lawsuit against Hillenbrand.

In July 1986 Hillenbrand settled the Crosswoods litigation with Ring Brothers for $40,000. Aetna paid one-third of the settlement, or $13,333, and gave up its right to recover this amount from Hillenbrand. On or about July 28, 1986, INA/Aetna filed a second action against Hillenbrand—a cross-complaint against both Hillenbrand individually and George F. Hillenbrand, Inc.

In March 1987 Pritchett asked Robinson to suspend work on the declaratory relief action while he consulted with his home office. He told his home office that INA/Aetna may "have little further basis for continuing the [declaratory relief action] except as to the reasonableness of the insured's attorney's fees." Yet he advised the insurer to stay the course.

In July 1987 Pritchett received $44,840 from another insurer for Aetna's defense costs. A year later, Robert Paine, a claims supervisor, replaced Pritchett and continued to prosecute the action despite Robinson's advice that it "would be extremely difficult to prevail . . . ." Hillenbrand added a bad faith claim to its cross-complaint.

In 1988 Marc Babin summarized the insurer's position as to coverage for damage to "other" property: "[T]he Complaint alleged that the siding was improperly nailed to the framing. The resulting damage to other property seemed minimal and at first glance did not seem to justify forcing the carrier

to pay the potential six figures in defense costs, merely because of this minimal damage."

The insurer brought a motion for summary adjudication of the bad faith claim while the declaratory relief action was pending. Judge Jeffrey L. Gunther held that "INA/Aetna's filing and maintenance of an action for declaratory relief cannot form the basis of an action for bad faith, for breach of fiduciary duty, or for other cause of action for wrongful conduct." In later proceedings, Judge Gunther granted Hillenbrand's motion for summary judgment, concluding that "INA/Aetna did owe a duty to defend Hillenbrand in the underlying action and thus cannot recover back its defense fees and costs from Hillenbrand."

The insurer, in a motion in limine before trial of the bad faith claim, asked the court to exclude any reference to the declaratory relief action. Robinson argued that the bad faith claim rested exclusively on the insurer's failure to investigate. The trial court held the declaratory relief action was "expunged" for the purposes of the bad faith trial. The jury thereafter returned a defense verdict.

In March 1991 Hillenbrand sued INA/Aetna for the malicious prosecution of both civil proceedings that had terminated in Hillenbrand's favor: the 1984 complaint for declaratory relief and the 1986 cross-complaint to recover defense costs. In April 1998 the jury awarded Hillenbrand $1,445,000 in compensatory damages and $14 million in punitive damages. INA/Aetna appeals the judgment in the malicious prosecution action. Hillenbrand appeals the trial court's reduction of punitive damages to $3 million and the directed verdict in favor of INA.[2]

DISCUSSION

I

■ To establish a cause of action for malicious prosecution, a plaintiff must prove that the prior action (1) had been commenced at the direction of the defendant and was pursued to a legal termination in the plaintiff's favor, (2) was brought without probable cause, and (3) was initiated with malice. (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 871 [254 Cal.Rptr. 336, 765 P.2d 498] (*Sheldon Appel*).) In *Sheldon Appel*, the Supreme Court adopted the objective standard to determine the presence or

---

[2]INA's motion to strike Hillenbrand's reply brief, and Hillenbrand's motion to strike INA's reply to Hillenbrand's opposition to INA's motion to strike, are denied.

absence of probable cause. "[T]he probable cause element calls on the trial court to make an objective determination of the 'reasonableness' of the defendant's conduct, i.e., to determine whether, on the basis of the facts known to the defendant, the institution of the prior action was legally tenable. The resolution of that question of law calls for the application of an *objective* standard to the facts on which the defendant acted. [Citation.]" (*Id.* at p. 878.) "In other words, in California, the commission of the tort of malicious prosecution requires a showing of an unsuccessful prosecution of a criminal or civil action, which any reasonable attorney would regard as totally and completely without merit [citation], for the intentionally wrongful purpose of injuring another person." (*Downey Venture v. LMI Ins. Co.* (1998) 66 Cal.App.4th 478, 499 [78 Cal.Rptr.2d 142] (*Downey Venture*).) We thus consider the elements of probable cause and malice.

*Probable Cause*

Two complaints filed by the insurer, both resolved in Hillenbrand's favor, serve as the basis for the malicious prosecution action at issue in this appeal. We must determine whether the insurer had probable cause to bring a declaratory relief action against its insured in which it asserted it had no duty to defend and to file a cross-complaint for recovery of the costs of defense after the claim for indemnity had been settled.[3] We first discuss the parameters of an insurer's duty to defend and then consider the insurer's assertion that a declaratory relief action is a preferred vehicle for resolving disputes regarding that duty.

*The Duty to Defend*

"The insured's desire to secure the right to call on the insurer's superior resources for the defense of third party claims is, in all likelihood, typically as significant a motive for the purchase of insurance as is the wish to obtain indemnity for possible liability." (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 295-296 [24 Cal.Rptr.2d 467, 861 P.2d 1153] (*Montrose Chemical*).) The duty to defend is broader than the duty to indemnify, so broad that an insurer must defend if there is *any* potential the claim might be covered. (*Montrose Chemical, supra,* 6 Cal.4th at p. 295; *Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1081 [17 Cal.Rptr.2d 210, 846 P.2d 792] (*Horace Mann*); *Gray v. Zurich Insurance Co.* (1966) 65 Cal.2d 263, 275 [54 Cal.Rptr. 104, 419 P.2d 168].) Any

---

[3]The insurer maintains that Hillenbrand cannot challenge probable cause because it conceded there was a coverage dispute by filing a cross-complaint for declaratory relief. The contention is without merit. Hillenbrand's acknowledgment there was an actual controversy says nothing about the tenability of the position the insurer took in denying coverage.

doubts as to whether the insurer has a duty to defend must be resolved in the insured's favor. (*Miller v. Elite Ins. Co.* (1980) 100 Cal.App.3d 739, 753 [161 Cal.Rptr. 322].)

The insurer insists that the allegations of the complaint fell within the faulty workmanship exclusion. But it is "clear that facts known to the insurer and extrinsic to the third party complaint can generate a duty to defend, even though the face of the complaint does not reflect a potential for liability under the policy." (*Montrose Chemical, supra,* 6 Cal.4th at p. 296.) The record reflects that the insurer considered the possibility that there was damage to other property, a covered risk, slight in comparison to the compelling evidence that the damage was caused by Hillenbrand's faulty workmanship, an excluded risk. However, "[w]e look not to whether non-covered acts predominate in the third party's action, but rather to whether there is *any* potential for liability under the policy. . . . [A]n insurer has a duty to defend the entire third party action if any claim encompassed within it potentially may be covered . . . ." (*Horace Mann, supra,* 4 Cal.4th at p. 1084.) In other words, the insurer's duty necessarily includes a defense to the entire action even though that may include claims that are *not* potentially covered. (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 48 [65 Cal.Rptr.2d 366, 939 P.2d 766] (*Buss*).)

Hence, in order to prevail on the issue of the duty to defend, "the insured must prove the existence of a *potential for coverage,* while the insurer must establish *the absence of any such potential.* In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot.* Facts merely tending to show that the claim is not covered, or may not be covered, but are insufficient to eliminate the possibility that resultant damages (or the nature of the action) will fall within the scope of coverage, therefore add no weight to the scales." (*Montrose Chemical, supra,* 6 Cal.4th at p. 300.)

*Malicious Prosecution and Declaratory Relief*

The insurer argues the probable cause requirement is modified where the underlying action is one for declaratory relief; it has the unrestrained right to bring a declaratory relief action as long as it is not frivolous. According to the insurer, there is a strong public policy favoring resolution of coverage issues through declaratory relief actions. (*Montrose Chemical, supra,* 6 Cal.4th at p. 301.) Here, continues the argument, the action was not frivolous because there were at least five cases supporting the insurer's interpretation of the "other property" provision, when even one would have sufficed to establish probable cause to file the complaint.

It is true as a general proposition that a declaratory relief action is the appropriate vehicle for resolving disputes involving the contested meaning of contractual language. (See, e.g., *John Hancock Mutual Life Ins. Co. v. Greer* (1998) 60 Cal.App.4th 877 [71 Cal.Rptr.2d 48]; *Chong v. California State Automobile Assn.* (1996) 48 Cal.App.4th 285 [55 Cal.Rptr.2d 648].) That is not to say, however, that a declaratory relief action cannot be maliciously prosecuted.[4]

Interestingly, the first reported case holding that prosecution of a declaratory relief action would support a claim for malicious prosecution involved an insurance company lawsuit against its insured for declaratory relief. In *Camarena v. Sequoia Ins. Co.* (1987) 190 Cal.App.3d 1089 [235 Cal.Rptr. 820] (*Camarena*), the court emphasized "the damage to individuals and society caused by the pursuit of groundless claims should not be underestimated." (*Id.* at p. 1095.) Yet the insurer argued that, as a matter of public policy, declaratory relief proceedings do not give rise to claims for malicious prosecution. The court rejected the insurer's notion of the prevailing public policy. (*Ibid.*)

Quoting from the Supreme Court in *Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 50-51 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878] (*Bertero*), the court reiterated the untoward damage to the individual subjected to a groundless declaratory relief action, and to the judicial process: " 'The malicious commencement of a civil proceeding is actionable because it harms the individual against whom the claim is made, and also because it threatens the efficient administration of justice. The individual is harmed because he is compelled to defend against a fabricated claim which not only subjects him to the panoply of psychological pressures most civil defendants suffer, but also to the additional stress of attempting to resist a suit commenced out of spite or ill will, often magnified by slanderous allegations in the pleadings.' " (*Camarena, supra,* 190 Cal.App.3d at p. 1095.) The court concluded: "In sum, there is nothing in the nature of declaratory relief actions which requires that we eliminate any potential liability for malicious prosecution." (*Id.* at p. 1097.)

Hillenbrand does not contest an insurer's right to reimbursement for defense costs pursuant to a reservation of rights, if and when it is determined

---

[4]The insurer's reliance on *Atlas Assurance Co. v. McCombs Corp.* (1983) 146 Cal.App.3d 135 [194 Cal.Rptr. 66] (*Atlas Assurance*) is misplaced. *Atlas Assurance,* a bad faith case, held that "[a]bsent other facts, the mere filing of an action to declare the insurer's right and duties relative to an insurance policy cannot form the basis of breach of the duty of good faith and fair dealing." (*Id.* at p. 150, italics added.) It simply does not give insurers carte blanche authority to file meritless lawsuits without liability for malicious prosecution.

there is no potential for coverage. It objects to the timing of that determination. The insurer insists it had the right to determine the coverage issue while the underlying case was still pending, thereby placing its insured in the untenable position of fighting the third party claim, assisted by the insurer, while simultaneously fighting the insurer on issues that would compromise its position in the third party litigation. The insurer maintained this position in the trial court even though it was aware of case law to the contrary, hoping that the trial court or Hillenbrand's lawyer would not find it.

In *Cal-Farm Ins. Co. v. TAC Exterminators, Inc., supra,* 172 Cal.App.3d 564 (*Cal-Farm Ins.*), the insurer also claimed coverage was excluded, and therefore it had no duty to defend its insured. But the applicability of the exclusion would not be determined until the underlying suit was resolved. The court observed: "We are aware that holding exclusion (j) disallows coverage if in the underlying action Sunset Ladder is held liable and the alleged indemnity agreement between TAC and Sunset Ladder is valid, makes for the interesting situation of Cal-Farm's having a duty to defend, even though it may not have to indemnify TAC against a loss under the alleged contract. This is not as incongruous as it seems. [¶] If we were to hold otherwise, any time an insurance company had a questionable claim due to an uncertain exclusion clause, it could defend, under a reservation of rights, and immediately bring an action for declaratory relief seeking to rid itself of the arguable duty to defend. As a result, the duty to defend would eventually be no broader than the duty to indemnify." (*Id.* at p. 580.)

In her concurring opinion in *Montrose Chemical, supra,* 6 Cal.4th 287, Justice Kennard echoes the same general rule enunciated in *Cal-Farm Ins.* "When an insured calls upon a liability insurer to defend a third party action, the insurer as a general rule may not escape the burden of defense by obtaining a declaratory judgment that it has no duty to defend. Were the rule otherwise, the insured would be forced to defend simultaneously against both the insurer's declaratory relief action and the third party's liability action. Because the duty to defend turns on the potential for coverage, and because coverage frequently turns on factual issues to be litigated in the third party liability action, litigating the duty to defend in the declaratory relief action may prejudice the insured in the liability action." (*Id.* at p. 305 (conc. opn. of Kennard, J.).)

There is no support in the cases for the insurer's notion that a declaratory relief action affords an insurer a convenient vehicle for determination of coverage issues, limited only by a standard that the action not be frivolous. To the contrary, the cases suggest declaratory relief actions are disfavored

because of the practical difficulties they create for an insured that must defend against two actions simultaneously. We thus return to the question of whether the insurer's action was supported by probable cause.

Two questions are pertinent to our discussion: What extrinsic facts did the insurer know at the time it filed and prosecuted the declaratory relief action, and what factual issues were to be resolved in the underlying third party liability action? Seven months before filing the declaratory relief action, the insurer knew that the lawyer it hired to represent the insured and Hillenbrand itself believed the damage to the condominiums was caused not by faulty workmanship, but by poor maintenance. Six months before the action was filed, the same lawyer reported to the insurer that defective siding materials might have caused damage to other property in the condominium units. Hillenbrand did not supply the materials. Three months before the action was filed, the claims manager assigned to the case recommended to the home office not to file a declaratory relief action, yet two weeks later, with no additional information, he warned Hillenbrand that a declaratory relief action "may be necessary." Two months before the action was filed, the insurer's lawyer told the same manager that design defects, rather than faulty workmanship, might have caused slope discrepancies. A month later, the manager asked the home office for permission to file the declaratory relief action even though, he conceded, "we will not come away from this case without an obligation to defend the insured." He then began to investigate the case.

Hence, before filing the suit, the insurer knew the alleged damages might have been caused by poor maintenance or design defects, both insured risks, and that there was a possibility there had been damage to other property that was not covered by the exclusion. It filed the declaratory relief action against its insured anyway.

The insurer had knowledge of these extrinsic facts pointing to the possibility of coverage, but the facts themselves were disputed and would not be resolved until the third party claim was litigated. Yet litigating the duty to defend in the declaratory relief action would clearly prejudice Hillenbrand in the Crosswoods litigation.

The insurer not only knew the extrinsic facts supporting potential coverage, it also was aware of the case law prohibiting an insurer from pursuing a declaratory relief action that would prejudice its insured in the third party litigation. The insurer's lawyer, Claudia Robinson, provided the insurer with a copy of Cal-Farm Ins., supra, 172 Cal.App.3d 564, explaining that it

"ha[d] not been spotted" by the trial judge considering the summary judgment motion and predicting that if either opposing counsel or the judge "pick[ed] up on" the case, the motion would be denied or reversed on appeal. She told the insurer "the presence of that case in the books adds strength to the insured's position . . . ." The insurer did not cite the case to the court and continued to pursue its declaratory relief action.

Clearly, the insurer did not sustain its burden of proving there was no potential coverage under its CGL policy. Both the facts and the law suggested to the contrary. The summary judgment ruling in favor of Hillenbrand only cemented what the insurer already knew, viz., that it had a duty to defend. Nevertheless, it filed another action, still maintaining it was entitled to recover the costs of defense.

On appeal, the insurer places great reliance on cases holding there was no coverage for damage to other property, insisting that these cases compel a finding that it had probable cause to file the declaratory relief action. We disagree. *Western Employers Ins. Co. v. Arciero & Sons, Inc.* (1983) 146 Cal.App.3d 1027 [194 Cal.Rptr. 688] and *Maryland Casualty Co. v. Imperial Contracting Co.* (1989) 212 Cal.App.3d 712 [260 Cal.Rptr. 797] both involved general contractors as the insureds, not subcontractors. In the case of a general contractor, all the work at the project is considered its work product, whereas in the case of a subcontractor, like Hillenbrand, only its portion of the work, such as siding, is the work product and damage to other parts of the project is considered damage to other property. *St. Paul Fire & Marine Ins. Co. v. Coss* (1978) 80 Cal.App.3d 888 [145 Cal.Rptr. 836] also involved a general contractor and there was no evidence of damage to property outside the project. *Rafeiro v. American Employers' Ins. Co.* (1970) 5 Cal.App.3d 799 [85 Cal.Rptr. 701] (*Rafeiro*) is of even less help to the insurer. In *Rafeiro*, the insurer filed its indemnity action after the trial of the third party claim. The trial court looked at the entire record of the third party trial and concluded that the damages awarded were all within an exclusion in the policy. *Rafeiro* does not stand for the proposition that the insurer does not have a duty to defend prior to resolution of the third party claim. Rather, it supports the proposition, never disputed by Hillenbrand, that under the proper set of facts, either undisputed or resolved by trial, the faulty workmanship exclusion precludes coverage.

The insurer erroneously contends that the federal case *Golden Eagle Ins. Co. v. Travelers Companies* (9th Cir. 1996) 103 F.3d 750 (*Golden Eagle Ins.*) vindicates the position it has taken on coverage. In *Golden Eagle Ins.*, the insured claimed that the cost of repairing "other property" in order to fix the

defective concrete was covered under the policy notwithstanding the faulty work exclusion. The court held that since the faulty work exclusion eliminates coverage for the cost of repairing the insured's work product, it also eliminates coverage for the cost of repairs to "other property" incidental to repairing the defective workmanship. We agree with Hillenbrand that *Golden Eagle Ins.* does not address the pertinent issue as to whether damage to "other property" caused by a subcontractor's work is covered. Consequently, the case is not authority for a proposition it did not consider.

We conclude the insurer's contention, at the time it filed—let alone prosecuted—the declaratory relief action and filed its cross-complaint, that it had a tenable claim it had no duty to defend Hillenbrand is indeed frivolous. The extrinsic facts known to the insurer disclosed the potential, indeed the likelihood, as recognized by the insurer's managers and lawyers alike, that it had a duty to defend its insured. The law was in accord. (*Buss, supra,* 16 Cal.4th at p. 49; *Val's Painting & Drywall, Inc. v. Allstate Ins. Co.* (1975) 53 Cal.App.3d 576, 582, 585 [126 Cal.Rptr. 267].) It simply decided to pursue a declaratory relief action in the absence of probable cause, thereby subjecting itself to a claim for malicious prosecution.

The dispositive issue in this case, therefore, is not probable cause but is whether the declaratory relief action was prosecuted with the requisite malice. Before we examine the sufficiency of the evidence to support the jury's finding of malice, however, we must consider the insurer's first contention that the defense verdict in the bad faith action collaterally estops Hillenbrand from challenging the probable cause finding and its second contention that Judge Warren's ruling granting a summary adjudication before reconsidering and reversing establishes probable cause as a matter of law. Neither contention has merit.

## II

The insurer brought a motion for summary adjudication of multiple issues in Hillenbrand's bad faith action. At the hearing on the motion, counsel for the insurer argued: "And I genuinely believe that Mr. Hillenbrand's distress does stem from the filing of the declaratory relief action in some degree, but that the only remedy under the law is for malicious prosecution." Apparently relying on *Atlas Assurance, supra,* 146 Cal.App.3d 135, Judge Gunther ruled that "INA/Aetna's filing and maintenance of an action for declaratory relief cannot form the basis of an action for bad faith, for breach of fiduciary duty, or for other cause of action for wrongful conduct." He ruled that the issuance of reservation of rights letters does not constitute bad faith and denied

summary adjudication of the remaining issues. Hillenbrand's bad faith claim went to trial and the jury returned a verdict for the insurer.

Hillenbrand did thereafter file an action for malicious prosecution, the very remedy the insurer had suggested in the bad faith proceedings. The insurer, however, then argued that the earlier ruling in the bad faith action collaterally estopped Hillenbrand from proving malicious prosecution. The insurer moved for judgment on the pleadings or, alternatively, for summary adjudication.

Judge John R. Lewis denied the insurer's motion, explaining his rejection of the collateral estoppel defense at some length: "While there are similarities between the issues in the bad faith action and this action, mere similarity is not the test. The issues must have been the same and must have been thoroughly and adequately litigated in the earlier action (if mere similarity were the test the denial of [a Code of Civil Procedure section] 128.5 motion would have the effect of always precluding a later malicious prosecution action, which does not appear to be the California law). [¶] The circumstances and filing of the declaratory relief action would have been but an evidentiary aspect of the issue of bad faith while the circumstances of the filing of the declaratory relief are the very heart of this malicious prosecution action. Thus, effectively, moving party here seeks to foreclose assertion of an essential element of plaintiffs' claim based upon an evidentiary determination in the prior action. (ie. [sic] whether the Court properly could consider in the prior action the circumstances of the bringing of the declaratory relief action[.)] The apparent law at the time of Judge Gunther's ruling was that it could not be considered. The later articulated law was that it could be considered but was only a factor."

The insurer alludes to general notions of res judicata and collateral estoppel, lumping together the two distinct legal concepts and claiming that, even if neither applies, "fundamental fairness and equity cry out for this Court to correct" such "a legally repugnant outcome." According to the insurer, "However labeled, California law should not sanction a malicious prosecution case which is predicated on an insurance coverage dispute that ended with a jury finding that the carrier acted in good faith toward its policyholder." The insurer is wrong.

First, the jury did not find that the insurer acted in good faith. Rather, in its special verdict, the jury found the insurer had not breached the implied duty of good faith and fair dealing. A plaintiff, however, must show at a minimum that benefits were delayed or withheld and that the insurer acted

unreasonably or without proper cause to prove a bad faith claim. (*Dalrymple v. United Services Auto. Assn.* (1995) 40 Cal.App.4th 497, 512 [46 Cal.Rptr.2d 845] (*Dalrymple*); *Love v. Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1151 [271 Cal.Rptr. 246].) The jury could have found that benefits were not unreasonably delayed though the insurer acted without proper cause. There was no affirmative finding, as the insurer suggests, that it acted in good faith.

It is also disingenuous for the insurer to seek judicial usurpation of the malicious prosecution verdict when it ardently strove to keep the filing of the declaratory relief action from the jury in the bad faith trial. At the insurer's insistence, the first jury heard absolutely no evidence that the insurer had filed or prosecuted the declaratory relief action and the cross-complaint to recover defense costs against its insured both before and after the third party claim was settled. The evidence introduced in the trial of the bad faith claim, therefore, was not identical to the evidence introduced at the trial of the malicious prosecution action, and the cases cited by the insurer are inapposite. (*Dalrymple, supra,* 40 Cal.App.4th 497; *State Farm Mut. Auto. Ins. Co. v. Superior Court* (1991) 228 Cal.App.3d 721 [279 Cal.Rptr. 116].) While the elements of the two causes of action bear substantial similarity in the abstract, the evidence offered at trial may in cases such as this be quite different. Hence, the bad faith claim that was sent to the jury was predicated only on the failure to investigate the claim. The heart of the malicious prosecution action simply was not a part of the trial of the bad faith claim. To contend, as the insurer does, that the jury verdicts are inconsistent or anomalous or that there is a void in California law that we should address ignores the record before us and the disparity in the evidence presented at the two trials.

The real issue is not whether the jury verdict in the bad faith claim precluded the malicious prosecution action, for clearly it did not, but whether Judge Gunther's ruling on the motion for summary adjudication collaterally estopped Hillenbrand from asserting that the filing and prosecution of the declaratory relief action constituted a malicious prosecution of an untenable legal claim. We agree with Judge Lewis that Judge Gunther's ruling did not address the viability of a malicious prosecution claim, for indeed, since the declaratory relief action was still pending, any such claim would have been premature. Therefore, the issue before Judge Gunther was not identical to the issue later raised in the malicious prosecution action to satisfy the rigid criteria for imposing collateral estoppel. (*American Internat. Underwriters Agency Corp. v. Superior Court* (1989) 208 Cal.App.3d 1357, 1362 [256 Cal.Rptr. 730].)

## III

Judge Warren granted the insurer's motion for summary judgment in the declaratory relief action, granted reconsideration, and reversed his first ruling. The insurer insists that one ruling in its favor, no matter how fleeting, establishes probable cause as a matter of law. Judge Edward J. Garcia of the federal district court disagreed. So do we. The record of the proceedings is the most telling.

During the initial hearing on the insurer's motion, the trial court was prepared to deny summary judgment because the insurer had failed to submit one of the two policies purchased by Hillenbrand and a declaration submitted by a purported employee was deficient. The insurer requested a continuance to obtain additional evidence to satisfy its burden of proof. Although the court pointed out that the moving party was not entitled to a continuance, it granted the insurer's request. The insurer did not disclose the evidence in its possession that the damage for which Hillenbrand had been sued was not caused by faulty workmanship, but by improper maintenance and the type of material used. The court granted the insurer's motion for summary judgment.[5]

In Hillenbrand's motion for reconsideration, it urged the court to consider additional evidence that had been acquired since the hearing on the motion for summary judgment, including transcripts from depositions of the homeowners. Many of these homeowners described damage to property other than the siding installed by Hillenbrand, and over 125 additional depositions were still pending. During the first week of the depositions, five of 11 homeowners had claimed damage to "other property" allegedly caused by Hillenbrand's faulty workmanship.

In May 1986, Robinson advised Pritchett: "At the hearing on the motion to reconsider, Judge Warren indicated that he had gone back over materials submitted to the court on April 14, 1986 by Wohl's office and had concluded that those papers may have established damage to 'other property' that is validly claimed in the underlying action. He specifically referenced cracked tiles, damage to insulation, and damage to sheetrock." Judge Warren revoked and set aside his earlier ruling granting summary judgment in its entirety and denied the insurer's motion.

In a later motion for summary judgment in the malicious prosecution action, the insurer argued that Judge Warren's initial ruling granting summary judgment established probable cause to file the declaratory relief action

---

[5]The parties dispute the significance of the insurer's failure to cite *Cal-Farm Ins.*, *supra*, 172 Cal.App.3d 564. We discuss the insurer's conduct in this regard in our discussion of malice and punitive damages at pages 814-821, *post*.

as a matter of law. The insurer contended that Hillenbrand's additional evidence was merely cumulative and that Judge Warren had expressly considered, and rejected, Hillenbrand's "other property damage" argument. Judge Garcia rejected the insurer's argument. He stated, "I think that Judge Warren ruled without all of the facts before him. And when he got the additional facts, on the motion for reconsideration, he reversed himself completely. This isn't a case where an Appellate Court reversed him. He just reserved [*sic*] himself when he had the full facts. And I recall that he also made a statement that he simply misapplied the law in the matter. So, I don't find that the previous erroneous decision by, admittedly, by Judge Warren has any effect, whatsoever, on the determination of probable cause. And is distinguishable from cases that you cite, where the reversal was by Appellate Court after the initial decision."

 There are, as Judge Garcia suggested, many cases that hold that a judgment or verdict after trial in favor of the plaintiff establishes the proceedings were prosecuted with probable cause, even if the case is later reversed on appeal. (*Cowles v. Carter* (1981) 115 Cal.App.3d 350, 356 [171 Cal.Rptr. 269] (*Cowles*).) According to *Cowles*, the inquiry is: "Did a trier of fact after a fair adversary hearing reach a determination on the merits against the defendant in the prior proceeding? If the answer is in the affirmative, the defendant in that proceeding may not thereafter institute an action for malicious prosecution, whether the matter was criminal or civil, even though he shows that the determination in question was reversed on appeal or set aside by the trial judge." (*Id.* at p. 358.)

In *Cowles*, the trial court denied a defense motion for nonsuit and the jury returned a verdict for the plaintiff. The judge thereafter reversed the jury's determination by granting a motion for judgment notwithstanding the verdict. "[I]t was the 'dual action' of the court's denial of the nonsuit motion and the initial jury verdict for plaintiff (even though later overturned), which established probable cause." (*Lucchesi v. Giannini & Uniack* (1984) 158 Cal.App.3d 777, 787, fn. 11 [205 Cal.Rptr. 62].) The holding in *Cowles* "was based on the notion that persons who initiate civil proceedings should not thereafter be subjected to malicious prosecution litigation unless it could be shown that they acted without probable cause—and that if probable cause had been determined by the trier of fact in the prior proceedings, it was not subject to reevaluation even when the jury's determination was reversed." (*Hufstedler, Kaus & Ettinger v. Superior Court* (1996) 42 Cal.App.4th 55, 65 [49 Cal.Rptr.2d 551].)

The same logic has been extended to summary judgment rulings. "Denial of a *defendant's* summary judgment motion provides similarly persuasive

evidence that a suit does not totally lack merit" (italics added) because "summary judgment rulings usually are grounded in a dependable evaluation of the facts" and "the judge denying summary judgment is *impartial*." (*Roberts v. Sentry Life Insurance* (1999) 76 Cal.App.4th 375, 383 [90 Cal.Rptr.2d 408].)

These general principles are somewhat self-evident and consistent with the public policy forestalling the filing of unwarranted, groundless litigation. (*Sierra Club v. Superior Court* (1985) 168 Cal.App.3d 1138, 1147 [214 Cal.Rptr. 740].) A verdict following a jury trial or a ruling following a thorough exploration of the evidentiary and legal basis for a claim is certainly indicative, if not conclusive, that the underlying action was tenable, even if unsuccessful. But the insurer has not cited any cases, and we have found none, where a ruling reversed and set aside following a successful motion for reconsideration was found to be conclusive evidence of probable cause. Such a rule simply would not comport with existing authority or the policies underlying the tort of malicious prosecution.

The facts of this case are far different from those presented in the reported cases. Here, the trial judge, upon receiving additional evidence and reconsidering his earlier ruling, reversed himself. The insurer insists that the judge's mistaken decision, even though it was rectified soon after it was made, conclusively establishes that its position was tenable. According to the insurer's rationale, there is no opportunity for redemption; the mistake is fatal to a subsequent action for malicious prosecution. We disagree.

A favorable ruling or verdict after trial is conclusive evidence that the lawsuit was not unwarranted or groundless. But a ruling reconsidered and rectified sheds no light on the legal viability of a claim. Particularly in a case such as this, when the trial court considers new evidence on rehearing, even if cumulative, the significance of the earlier ruling is lost. It is as if to say the insurer can validate its prosecution for years of a meritless lawsuit because a trial judge, in a moment of confusion or misunderstanding, temporarily erred. We are unwilling to deny a plaintiff a remedy for malicious prosecution simply because a trial judge committed a mistake he himself promptly undid.

The insurer insists that *Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811 [123 Cal.Rptr.2d 19, 50 P.3d 733] (*Wilson*) dictates the opposite result. According to the insurer, *Wilson* establishes that a conclusive presumption of probable cause as a matter of law arose when, on reconsideration of the ruling granting the summary judgment, Judge Warren found the existence of a triable issue of fact. We disagree for several reasons.

██ In *Wilson*, the trial court denied the *defendants'* motion to strike a SLAPP suit (strategic lawsuit against public participation) because the *plaintiffs* sustained their burden of demonstrating a reasonable likelihood they would prevail on the merits. After the plaintiffs ultimately lost at trial, the defendants filed a complaint for malicious prosecution. The Supreme Court held that the denial of the motion to strike is equivalent to a finding of probable cause. (*Wilson, supra,* 28 Cal.4th at p. 815.) The plaintiffs were the beneficiaries of the denial of the motion to strike and later used that ruling to defeat the defendants' action for malicious prosecution.

██ The motion for summary judgment in the insurer's declaratory relief action is very different from the motion to strike the SLAPP suit in *Wilson*. Here, the insurer, as plaintiff, moved for summary judgment and lost. But Hillenbrand had not filed a cross-motion for summary judgment. As a consequence, the trial court could not enter judgment in its favor.[6] Instead, the trial court found there was a triable issue of fact. The insurer insists that the finding of a triable issue, even in this unique context, is the equivalent of probable cause. Not so.

Unlike the plaintiffs in *Wilson* who prevailed on the motion to strike, the insurer *lost* the summary judgment and yet attempts to use that ruling to preclude a malicious prosecution claim. If we were to accept that argument, an insurer who loses its motion for summary judgment in a declaratory relief action would thereby insulate itself from a malicious prosecution claim. That is not a result compelled by *Wilson*.

In *Wilson*, the underlying action was not one for declaratory relief involving an insurer's duty to defend where that duty arises as long as there is any potential for coverage. Rather, *Wilson* involves a SLAPP suit where the plaintiffs, in order to avoid a motion to strike, must make an affirmative showing that they will prevail on the merits. Here, the denial of the summary judgment did not suggest that the insurer would prevail on the merits but merely exposed the existence of a triable issue.

Unlike *Wilson*, this case involves the tricky coalescence of declaratory relief, malicious prosecution, and an insurer's duty to defend. Probable cause to defeat a malicious prosecution claim exists if there is an arguably tenable

---

[6]Hillenbrand prepared an order denying the insurer's motion for summary judgment. The first paragraph of the proposed order states that the court found the insurer had the duty to defend. The court crossed out the paragraph presumably because Hillenbrand had failed to file its own request for summary judgment. The absence of a definitive finding that there was a duty to defend does not mean, as the insurer suggests, there was a tenable claim that there was no duty to defend. The court simply could not rule on an issue that was not before it.

claim. Under the *Wilson* rationale, if there is a triable issue of fact, the claim is at least tenable. But that is not true in a declaratory relief action to determine whether there is a duty to defend because of the well-established proposition that the duty to defend arises whenever there is *potential* coverage. Hence, the existence of a triable issue of fact tends to negate, rather than to establish, probable cause due to the simple fact that a triable issue exposes potential coverage. *Wilson*, in short, does not apply to the facts before us.

## IV

The insurer asserts that it relied on the advice of its counsel as a matter of law, thereby establishing a complete defense to liability for malicious prosecution. (*DeRosa v. Transamerica Title Ins. Co.* (1989) 213 Cal.App.3d 1390 [262 Cal.Rptr. 370].) Hillenbrand points out that prior to the summary adjudication of the probable cause issue, the insurer expressly declined the defense of reliance on advice of counsel. Judge Garcia explained: "From the commencement of the case in this court until November of 1992 defendants steadfastly maintained that they did not plan to rely on the affirmative defense of 'reliance on advice of counsel.' " Hillenbrand urges us to ignore the resurrected defense because the insurer waived the defense below.

We need not be distracted by the nuances of waiver. The jury heard the evidence at trial and rejected the same inferences and arguments reiterated by the insurer on appeal. As a consequence, the scope of appellate review is quite limited. We must determine whether there is substantial evidence to support the jury's finding that the insurer did not rely on the advice of counsel. (*Bertero, supra*, 13 Cal.3d at p. 54.)

The insurer catalogues the involvement of the Mackenroth law firm in the filing and prosecution of the declaratory relief action and the cross-complaint for reimbursement of defense costs and insists that even though it relied on the firm's advice, it was obligated to independently investigate the facts to avoid a bad faith claim. (*Garner v. American Mut. Liability Ins. Co.* (1973) 31 Cal.App.3d 843 [107 Cal.Rptr. 604].) In other words, laments the insurer, claims personnel often express personal opinions on coverage during their investigations, and those opinions do not obliterate an insurer's right to rely on its lawyer's advice. While we agree that an insurer does have a right to rely on the advice of counsel in the proper case, we do not agree the insurer here was put in a no-win predicament, caught between its right to rely on counsel and its duty to independently assess coverage.

As Hillenbrand appropriately points out, an insurer is not exposed to malicious prosecution liability if it has probable cause to file and prosecute

its complaint, whether or not it seeks the advice of counsel. Reliance on the advice of counsel is but one way to establish probable cause. Moreover, reliance on advice of counsel is not a defense if the defendant knows, as the insurer did in this case, that it does not have probable cause to file suit. (*Sierra Club Foundation v. Graham* (1999) 72 Cal.App.4th 1135, 1153-1154 [85 Cal.Rptr.2d 726].) Good faith reliance is an obvious prerequisite. (*Bertero, supra,* 13 Cal.3d at pp. 53-54.)

The jurors heard evidence from which they could infer that the insurer itself knew it lacked probable cause to file the lawsuit and, therefore, that good faith reliance on the advice of counsel was lacking. Cerf was uninterested in obtaining a written opinion on coverage, typically done when a coverage dispute erupts. He realized the insurer had a duty to defend, yet he recommended filing the initial action. Having heard Claudia Robinson's testimony, the jurors certainly could have concluded that Cerf, not the lawyers, controlled the claim and made the decision whether, and when, to prosecute the lawsuits. The jurors might also have noticed that the written documents introduced into evidence by the insured to establish its claim of reliance on counsel were dated after the declaratory relief action was filed. In sum, the jury determined that as a matter of fact the insurer had not placed good faith reliance on its lawyers and blindly signed on to a lawsuit it honestly believed was meritorious. We are not at liberty to disturb that finding, supported as it is by substantial evidence.

## V

The insurer challenges the sufficiency of the evidence of malice to support the tort of malicious prosecution and the award of punitive damages. ▓ "The malice element of the malicious prosecution tort goes to the defendant's subjective intent in initiating the prior action. [Citations.] It is not limited to actual hostility or ill will toward the plaintiff. Rather, malice is present when proceedings are instituted primarily for an improper purpose. Suits with the hallmark of an improper purpose are those in which: ' ". . . (1) the person initiating them does not believe that his claim may be held valid; (2) the proceedings are begun primarily because of hostility or ill will; (3) the proceedings are initiated solely for the purpose of depriving the person against whom they are initiated of a beneficial use of his property; (4) the proceedings are initiated for the purpose of forcing a settlement which has no relation to the merits of the claim." ' " (*Sierra Club Foundation v. Graham, supra,* 72 Cal.App.4th at pp. 1156-1157.)

The proof of malice to sustain a malicious prosecution action bears substantial similarity to the proof of malice necessary to support a punitive

damage award. (*Downey Venture, supra,* 66 Cal.App.4th at p. 495, fn. 23.) The most significant difference is the quantum of proof. Section 3294 of the Civil Code sets forth when exemplary damages are allowable, the requisite quantum of proof, and the definition of malice as follows: "In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant. [¶] . . . [¶] . . . 'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others."

Clearly, a breach of fiduciary obligation alone does not permit an award of punitive damages. " 'The wrongdoer " 'must act with the intent to vex, injure, or annoy, or with a conscious disregard of the plaintiff's rights. [Citations.]' " Punitive damages are appropriate if the defendant's acts are reprehensible, fraudulent or in blatant violation of law or policy. The mere carelessness or ignorance of the defendant does not justify the imposition of punitive damages. . . . Punitive damages are proper only when the tortious conduct rises to levels of extreme indifference to the plaintiff's rights, a level which decent citizens should not have to tolerate.' " (*Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1287 [31 Cal.Rptr.2d 433].)

The jury must apply this standard "in light of the relative economic power, sophistication and legal expertise of the parties. What might be acceptable behavior between two large corporations butting heads in the marketplace looks quite different when there is a substantial difference in economic power or sophistication between the parties. Indeed, California cases upholding punitive damages typically do so in cases involving small plaintiffs, usually ones that are in distress of one form or another." (*Slottow v. American Cas. Co.* (9th Cir. 1993) 10 F.3d 1355, 1361-1362.) ■ Moreover, an insurer's obligations are " 'rooted in their status as purveyors of a vital service labeled quasi-public in nature. . . . Insurers hold themselves out as fiduciaries, and with the public's trust must go private responsibility consonant with that trust.' [Citation.] Furthermore, the relationship of insurer and insured is inherently unbalanced; the adhesive nature of insurance contracts places the insurer in a superior bargaining position. The availability of punitive damages is thus compatible with recognition of insurers' underlying public obligations and reflects an attempt to restore balance in the contractual relationship." (*Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 820 [169 Cal.Rptr. 691, 620 P.2d 141].)

■ Our task on review of a jury verdict for malicious prosecution and a jury award of punitive damages is to review the entire record to determine whether there is substantial evidence to support the jury's findings. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874 [197 Cal.Rptr. 925].) Jurors, not appellate justices, hear the evidence and determine the facts. Properly instructed, they are the primary arbiters of acceptable behavior between an insurer and its insured. It is they, with their collective understanding of the limits of what decent citizens ought to have to tolerate, who are charged with assessing the degree of reprehensibility and meting out an appropriate financial disincentive for untoward claims practices. Their authority is not unbridled. However, our role in reviewing the jury's work is a deferential one.

■ Nevertheless, the insurer insists there is no evidence of malice. It challenges Hillenbrand to identify a sinister motive, despite a legion of cases emphasizing that a plaintiff need not prove evil intent. (*Mock v. Michigan Millers Mutual Ins. Co.* (1992) 4 Cal.App.4th 306, 328-329 [5 Cal.Rptr.2d 594] (*Mock*).) Thus, the dispositive issue is not motive, but malice.

There is ample evidence the insurer filed the two lawsuits against its insured for improper purposes. Before filing the declaratory relief action, Cerf knew the insurer had a duty to defend based on the damage to other property and the viability of Hillenbrand's defense that poor maintenance, and not faulty workmanship, caused the damage to the condominium units. He ignored evidence that the cause of the problems with the siding (buckling and loose siding sheets) was poor maintenance, that the siding damage might have been caused by inadequate or defective siding material, and that some of the property damage being blamed on Hillenbrand might have been due to defective design of the balconies it built. He blatantly conceded the insurer had a duty to defend, yet he recommended filing the action. He also acknowledged that it was likely the case against Hillenbrand would be settled for a small fraction of the alleged damages and that Aetna was but one of several insurance companies that had issued policies with potential coverage. Although by his own assessment the insurer's exposure was small and the duty to defend certain, Cerf encouraged the INA home office to file a declaratory relief action. The jury could infer, as Hillenbrand's counsel urged, that the insurer acted in conscious disregard of Hillenbrand's right to a defense. Moreover, the jury was free to infer that the insurer hoped to extract a settlement bearing no relation to the merits of the claim by unleashing an avalanche of litigation against a small framing contractor unprepared to withstand the onslaught of insurance defense maneuvering.

Proof of the malice necessary for a malicious prosecution action is a huge start in proving the malice necessary for punitive damages, but alone it is not

enough. ▮▮▮ In defining malice for punitive damages, the Legislature described two elements disjunctively: The defendant must intend to cause injury to the plaintiff *or* the defendant must engage in despicable conduct with a willful and conscious disregard of the rights of the plaintiff. (*Mock, supra,* 4 Cal.App.4th at p. 330.) ▮▮▮ "An insurance company acts with conscious disregard of the rights of others when it is aware of the probable harmful consequences of its conduct and willfully and deliberately fails to avoid those consequences." (*Id.* at pp. 330-331.)

▮▮▮ We concluded above there was substantial evidence to support the jury's finding that the insurer acted with conscious disregard of Hillenbrand's rights. But we agree with the insurer there is little evidence, if any, to suggest it intentionally attempted to harm or to hurt Hillenbrand. The question left open is whether there is substantial evidence that the insurer's conduct was despicable.

▮▮▮ " ' "Despicable conduct" is conduct which is so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people.' " (*Mock, supra,* 4 Cal.App.4th at p. 331.) ▮▮▮ The insurer defends its handling of Hillenbrand's claim as a reasonable business response to uncertain liability. It emphasizes that it never denied Hillenbrand a defense, it merely reserved its right to recover defense costs. Moreover, it paid its pro rata share of the settlement. The insurer seems to imply that protracted, aggressive litigation is an accepted component of modern business practices that, while annoying, aggravating, or frustrating, cannot be characterized as "vile, base, contemptible, miserable, wretched or loathsome." The jury disagreed.

The jurors apparently did not have the same appetite for litigation as did the insurer. They must have been persuaded by the considerable evidence that George Hillenbrand was devastated and debilitated by the lawsuits waged by his own insurer. Doctors, friends, and family members attested to the severe depression and emotional distress he suffered during more than a decade of fighting his insurer. He was depressed, with no remission of symptoms for years, believing he was losing everything as a result of the legal actions against him. He felt stripped of any sense of protection or defense he had against financial ruin or emotional decomposition and, a once successful contractor and leader in his field, was beaten like a "whipped dog

who lost his confidence."[7] While the insurer argues it never intended to harm Hillenbrand, the evidence indicates it was told by its lawyer, Claudia Robinson, that George Hillenbrand was suffering genuine emotional distress from the trauma of the litigation. Hence, the insurer knew it was harming its insured whether it desired that result or not. On appeal, as before the trial court, the insurer denies that its conduct was despicable. However, the jury was free to conclude on this evidence that the protracted degradation of an honest and hard-working businessman, and the conscious indifference to his suffering, was despicable.

Nor was the jury obliged to excuse frivolous litigation in the name of misguided business decisions. Since the insurer considered the costs of defense were not warranted by the amount of damage to covered property, it simply sued its insured and argued it had no duty to indemnify or defend, hoping it might get the trial court to agree. To convince the trial court it had no duty to defend or indemnify, the insurer concealed its evidence of damage to other property, leaving it to the insured to prove the faulty workmanship exclusion did not apply. Immediately before CIGNA filed its summary judgment motion, Claudia Robinson wrote to CIGNA that, "if there is a significant claim for damage to other property, I suppose that it will surface in the opposition to our motion for summary judgment." The insurer thus understood that the faulty work exclusion did not apply to other property damage, yet it was willing to put the burden on the insured to prove the exclusion did not apply. This tactic worked momentarily when Judge Warren initially granted a summary judgment. However, once Judge Warren was given all of the facts as to damage to other property, he, like the claims managers and lawyers for the insurer, realized the insurer had a duty to defend because there was potential, indeed likely, coverage under the policy.

As the trial court aptly concluded in denying the motion for judgment notwithstanding the verdict and a new trial, "The jury could reasonably have concluded that defendant's true purpose in pursuing the duty to defend issue was to improperly further its own interests while recognizing that its conduct subjected plaintiffs to economic and emotional hardship." There was substantial evidence to support the jury's conclusion that the insurer's conduct, including suing its insured in spite of its knowledge of facts giving rise to the duty to defend, was despicable.

Or the jury simply may have concluded that the cumulative effect of the insurer's conduct during more than a decade of litigation was despicable.

---

[7]The jury heard evidence that George Hillenbrand, having lost his father when he was six years old and having begun working for pay when he was 10, became a hard-working, self-made entrepreneur. In the early 1970's, he was a successful framing contractor.

While no single incident may have been sufficiently reprehensible to merit exemplary damages, the jury could have determined that the following evidence reflected a pattern of despicable conduct: failing to disclose the facts and the law to the trial court; asking the insured to admit to facts in the declaratory relief action that would be fatal to its position in the underlying lawsuit; suing the insured a second time, following the denial of its motion for summary judgment; denying in its actions against Hillenbrand that poor maintenance caused the damage while arguing, in defense of the first party claims, that the siding problems were caused by poor maintenance; deposing the insured before the settlement conference in the Crosswoods litigation; and continuing to prosecute the declaratory relief action to get other carriers to reimburse it for at least two-thirds of its defense costs and to get the insured to drop his bad faith claim. While claims adjusters and defense lawyers can be hardened to aggressive, even mean-spirited, litigation, the jury had the prerogative to decide whether the insurer's claims handling exceeded the bounds of what a reasonable insured ought to be expected to endure. In other words, the jury is the barometer of despicability.

The insurer contends the jury, however, was misguided. The jury was instructed that it could infer malice from the absence of probable cause. The jury was also instructed on the meaning of malice for malicious prosecution (BAJI No. 7.34) and for punitive damages (BAJI No. 14.72.1) as well as the elements of malicious prosecution, the burden of proof, and the liability of a corporation for the acts of its agents.

Despite the context in which the instruction was given, the insurer argues that allowing the jurors to infer malice from the absence of probable cause constitutes reversible error. The insurer relies on *Sheldon Appel, supra,* 47 Cal.3d at page 871 and its progeny. There is no question the Supreme Court in *Sheldon Appel* substantially altered the analysis of probable cause necessary to support a malicious prosecution claim, emphasizing that probable cause was to be measured objectively rather than subjectively. That is not to say, however, that the absence of probable cause cannot be considered by the jury.

In *Downey Venture, supra,* 66 Cal.App.4th 478, the court explained that the absence of probable cause alone was insufficient to support an inference of malice. "Merely because the prior action lacked legal tenability, as measured objectively (i.e., by the standard of whether any reasonable attorney would have thought the claim tenable [citation]), *without more,* would not logically or reasonably permit the inference that such lack of probable cause was accompanied by the actor's subjective malicious state of

mind. In other words, the presence of malice must be established by other, additional evidence." (*Id.* at p. 498.) The court further clarified its explanation as follows: "We do not mean to suggest, however, that the court's legal determination that probable cause is absent is not a fact or circumstance which the jury may consider in determining the presence of malice. We hold only that, standing alone, it is not sufficient to demonstrate malice." (*Id.* at pp. 498-499, fn. 29.)

The challenged instruction did not suggest that the inference of malice drawn from the absence of probable cause was sufficient to demonstrate malice. When taken in the context of all the instructions on the elements of malicious prosecution and malice, it correctly informed the jury that one inference to be drawn from the frivolous nature of the lawsuits was a malicious intent. We conclude that the instructions, when taken as a whole, did not mislead the jury to conclude that such an inference alone was sufficient to prove malice. As we have discussed at length above, there was far more evidence of malice than the mere absence of probable cause. There was no instructional error.

*The Remittitur*

In response to the insurer's motion for a new trial, the trial court reduced the $14 million award of punitive damages to $3 million. The trial court concluded that a reduction in the punitive damage award was required because: (1) there was no evidence the insurer engaged in a pattern and practice of such conduct; (2) the underlying dispute was complex; (3) the insurer provided Hillenbrand with *Cumis* counsel,[8] albeit with a reservation of rights; (4) the insurer was assisted in its tortious conduct by its lawyer; (5) existing law encourages insurance carriers to seek declaratory relief for resolution of liability policy coverage; (6) the insurer sought a declaration as to both its duty to defend and its duty to indemnify, and Hillenbrand conceded that the filing and pursuit of the duty to indemnify claim by itself would not have led to a malicious prosecution action; and (7) there was no evidence that the insurer or its agents harbored any actual ill will or hostility toward Hillenbrand or that they expressed any intention to harm Hillenbrand. We review the trial court's reduction of the amount of damages as a condition to denying a motion for a new trial for abuse of discretion. (*Gerard v. Ross* (1988) 204 Cal.App.3d 968, 978 [251 Cal.Rptr. 604].)

Hillenbrand concedes there was no evidence the insurer had maliciously prosecuted other lawsuits against its insured. A pattern or practice of

---

[8]Civil Code section 2860; *San Diego Federal Credit Union v. Cumis Ins. Society, Inc.* (1984) 162 Cal.App.3d 358 [208 Cal.Rptr. 494, 50 A.L.R.4th 913] (*Cumis*).

wrongful conduct is often introduced as evidence of malice or oppression to justify a punitive damage award. (*Liberty Transport, Inc. v. Harry W. Gorst Co.* (1991) 229 Cal.App.3d 417, 435-437 [280 Cal.Rptr. 159], disapproved on other grounds in *Adams v. Murakami* (1991) 54 Cal.3d 105, 116 [284 Cal.Rptr. 318, 813 P.2d 1348] (*Adams*).) ▮▮▮ While such a pattern is not a prerequisite to an award of punitive damages, the court properly considered the absence of evidence of similar practices as a relevant factor in determining whether the $14 million award was excessive.

The multiple other factors considered by the trial court were equally pertinent. The active participation of counsel, while not sufficient in the jury's view to exonerate the insurer, was in the court's view a factor in mitigation of the degree of reprehensibility. We agree that the lawyers' encouragement, coupled with the lack of evidence that the insurer was motivated by dislike, vendetta, or ill will toward George Hillenbrand personally, renders the insurer's conduct less reprehensible than a case in which a defendant single-handedly targets a vulnerable plaintiff with the venom of a Shakespearean Iago.

Simply put, we agree with the trial court that there was substantial evidence to support the jury's finding of malice for malicious prosecution and for punitive damages. But charged with the task of assessing just how reprehensible the insurer's reprehensible conduct was, the trial court articulated many credible factors suggesting that this case is not as bad as they come, and while the insurer's conduct must be deterred, it was not so egregious as to justify an extraordinarily large punitive award. "The goal is to award an amount of punitive damages that is sufficient to deter the conduct but is not excessive." (*Notrica v. State Comp. Ins. Fund* (1999) 70 Cal.App.4th 911, 952 [83 Cal.Rptr.2d 89]; *Adams, supra,* 54 Cal.3d at p. 111.)

## VI

▮▮▮ The insurer asks us to reverse the judgment because one of the jurors was a convicted felon, a fact he disclosed on the juror questionnaire form. It claims that neither the trial judge nor the lawyers could usurp the Governor of his exclusive right to pardon. Moreover, while the insurer acknowledges it knew the juror was a convicted felon, it did not know just how many felonies he had committed.

The right to pardon simply is not involved. The fact the juror disclosed the grounds for disqualification was sufficient to trigger the insurer's obligation to challenge the juror for cause. "We . . . have long held that a defendant's

objection to a juror's competency, first made after trial, is belated and not cognizable on appeal." (*People v. Hill* (1992) 3 Cal.4th 959, 985 [13 Cal.Rptr.2d 475, 839 P.2d 984], overruled in part on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618]; *People v. Sanford* (1872) 43 Cal. 29, 31-32 []; *People v. Mortier* (1881) 58 Cal. 262, 266-268 [].) The insurer waived its objection to the tainted juror.

VII

*Civil Code Section 2351*

Aetna sent Hillenbrand's claim to INA in 1983. For the next 15 years, INA handled the claim, brought and defended a number of summary judgment motions, pursued a declaratory relief action and a cross-complaint to recover defense costs, and defended the malicious prosecution case. At the end of a lengthy trial, INA, for the first time, asserted that it was not liable as an agent for the insurer under section 2351 of the Civil Code because its employees were subagents of the insurer.

Civil Code section 2351 states: "A sub-agent, lawfully appointed, represents the principal in like manner, with the original agent; and the original agent is not responsible to third persons for the acts of the sub-agent." INA argues that its claims supervisors, Michael Cerf and David Pritchett, were subagents as a matter of law, and therefore it, as the agent, "is not responsible to third persons" for their handling of Hillenbrand's case. Taken to its logical extreme, INA's proposed application of section 2351 would obliterate corporate responsibility for the acts of its employees any time the corporation was acting as an agent. The trial court articulated the same concern.

"I'm just having some trouble with this, conceptually, and maybe my thoughts are not really on point, but I'm going to share them anyway. [¶] What does it mean? Who is a sub-agent, and what does it mean to be lawfully appointed? It seems to me you're relying on the Civil Code section that states this proposition, but it seems in the reading of it, it seems to contemplate a situation where an agent appoints somebody completely independent to assume a responsibility and, thereafter, the agent who made the appointment [is] not responsible for the conduct of the sub-agent. [¶] But here, a situation—you have a corporation acting through its employees, who are agents or employees, I assume. And because of its corporate status, it seems to me that just that the fact it is a corporation and acts through employees kind of insulates it from a responsibility from the acts of its employees. I have trouble accepting that, conceptually."

So do we, as a matter of fact and as a matter of law. INA asserted in the trial court, and reasserts on appeal, that the claims supervisors were agents of the insurer. INA insists that Hillenbrand's stipulation that INA was acting as the insurer's agent was dispositive.

However, the stipulation had nothing to do with INA's employees. As INA recognizes, there is no evidence to support the notion that the insurer controlled the acts of INA's employees. INA argues that a corporation can only act through its authorized representatives and "INA can only act through its employees, who were the subagents in the underlying insurance claim." INA cites no authority for this proposition. Indeed, neither side cites to any authority on point. It is not surprising they have found none; INA's argument is contrary to fundamental principles of corporate and agency. liability.

Neither of the two cases INA cites for the proposition that where an agent is a corporation, its employees are subagents of the principal (*U.S. v. Tianello* (M.D.Fla. 1994) 860 F.Supp. 1521 (*Tianello*); *Andrews v. Schram* (1997) 252 Neb. 298 [562 N.W.2d 50] (*Andrews*)) interprets or cites Civil Code section 2351. Moreover, neither case bears any factual similarity to this case. *Tianello* was a criminal prosecution in which the government failed to prove that Tianello, an employee of a mortgage company owned by a bank, was an agent of the bank. *Andrews* involved a scam by a president and treasurer of a financial services company whereby they misappropriated funds of Lloyd's of London. The court found there was ample evidence to support an attachment and garnishment of their accounts. Neither case exonerated the agent for the wrongdoing of its subagent.

INA refers to a line of cases that sheds some light on the purpose of Civil Code section 2351, although none of these cases is factually or legally on point. (*Malloy v. Fong* (1951) 37 Cal.2d 356 [232 P.2d 241] (*Malloy*); *Bowers v. Olch* (1953) 120 Cal.App.2d 108 [260 P.2d 997]; *Bond v. Pitzer* (1958) 163 Cal.App.2d 1 [328 P.2d 1009]; *Towt v. Pope* (1959) 168 Cal.App.2d 520 [336 P.2d 276].) These cases involved attempts by third parties to recover from supervisors of negligent employees. Relying on section 2351, the courts exonerated the supervisors. Typical was the rationale expressed in *Malloy, supra,* 37 Cal.2d at page 378: "The doctrine of *respondeat superior* is not applicable to the relationship between a supervisor and his subordinate employees. The supervisor occupies an economic and legal position quite different from that of the employer. It is not the supervisor's work that is being performed, nor does he share in the profits which the employees' conduct is designed to produce. In the usual situation,

furthermore, he, like his subordinates, is a wage earner, and he is seldom able to respond in damages to an appreciably greater extent than they. For these reasons, the law has shifted financial responsibility from the supervisor, who exercises immediate control, to the employer, who exercises ultimate control and for whose benefit the work is done. [Citation.] Section 2351 of the Civil Code codifies this principle and has been uniformly interpreted to exempt superior employees from vicarious liability to third persons for the tortious conduct of subordinates."

INA would turn these principles on their heads. Where these cases suggest that the supervisors, as agents, are not liable, they do not suggest that corporate employers are exonerated while their employees, as subagents, are held liable. (*Jacques Interiors v. Petrak* (1987) 188 Cal.App.3d 1363 [234 Cal.Rptr. 44] (*Jacques Interiors*).) While not dispositive on the Civil Code section 2351 question, *Jacques Interiors*, as here, involved the liability of a claims adjuster individually and his company. Edwin Petrak, the individual adjuster, and Top Claims Service, Inc., the company, appealed from a judgment entered following a jury award of $150,000 in compensatory damages and $100,000 in punitive damages for malicious prosecution. The Court of Appeal held that there was substantial evidence that Petrak acted with malice and without probable cause in investigating the claim supporting the jury verdict against both defendants. The corporation was not exonerated because its employee committed the tort of malicious prosecution.

The same result should apply here: INA has attempted to apply language of a statute to a situation the statute was not designed to embrace and to make sweeping conclusions of law divorced from any facts in this record. We conclude there is no evidence the insurer could control the acts of INA's employees or that the insurer agreed INA would be absolved of liability when it acted in the only way a corporation can act—through its employees. Civil Code section 2351 does not provide an escape hatch for INA.

*Collateral Estoppel*

Hillenbrand urges us to remand the case for retrial of its claim for punitive damages against INA, contending the doctrine of collateral estoppel applies to preclude INA from litigating the liability issues. Insisting the jury did not find it had maliciously prosecuted the lawsuits, INA contends it is entitled to a new trial on liability as well as damages. While INA would have us ignore well-established doctrines of agency and collateral estoppel as well as the reality of who managed this case and how, Hillenbrand ignores the dilemma posed by the remittitur of punitive damages. Upon consideration of

these thorny issues, we conclude that Hillenbrand prevails on the collateral estoppel issue—INA is liable for the compensatory and punitive damages contained in the judgment—though its victory might be regarded as pyrrhic: the punitive damage award, as mitigated, is a cap on the amount of punitive damages to which it is entitled. We explain our reasoning.

We begin with the fundamental principle that "one who has a proprietary or financial interest in and controls the conduct of a lawsuit should expect to be, and can be, bound by the result reached in that lawsuit, even though not a party." (*Aronow v. LaCroix* (1990) 219 Cal.App.3d 1039, 1050 [268 Cal.Rptr. 866].) "Such control, however, need not be complete. [Citation.] And, preclusion can apply even in the absence of such control . . . ." (*Ibid.*)

The legalese encapsulating this principle is the doctrine of collateral estoppel. It is, and of course must be, rooted in fairness. A nonparty is bound by the result of a lawsuit only if it is in privity with a party who fully and vigorously represented its interests. "In the final analysis, the determination of privity depends upon the fairness of binding appellant with the result obtained in earlier proceedings in which it did not participate. . . . [¶] . . . A party is adequately represented for purposes of the privity rule 'if his or her interests are so similar to a party's interest that the latter was the former's virtual representative in the earlier action.'" (*Citizens for Open Access etc. Tide, Inc. v. Seadrift Assn.* (1998) 60 Cal.App.4th 1053, 1070 [71 Cal.Rptr.2d 77].)

The question thus posed is whether INA had a sufficient proprietary or financial interest in the malicious prosecution action and exerted sufficient control of the conduct of the lawsuit that it is fair that it be bound by the outcome of the judgment in the earlier action. The answer is a resounding yes. In *Lewis v. County of Sacramento* (1990) 218 Cal.App.3d 214 [266 Cal.Rptr. 678] (*Lewis*), we explained why.

" '[A] party will be collaterally estopped from relitigating an issue only if (1) the issue decided in a prior adjudication is identical with that presented in the action in question; *and* (2) there was a final judgment on the merits; *and* (3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication.' (*Clemmer v. Hartford Insurance Co.* (1978) 22 Cal.3d 865, 874 [151 Cal.Rptr. 285, 587 P.2d 1098] . . . .) . . . [¶] As noted in *Clemmer*, '[t]he concept [of privity] has . . . been expanded to refer . . . to such an identification in interest of one person with another as to represent the same legal rights [citations] and,

more recently, to a relationship between the party to be estopped and the unsuccessful party in the prior litigation which is "sufficiently close" so as to justify application of the doctrine of collateral estoppel.' " (*Lewis, supra,* 218 Cal.App.3d at p. 217.) Due process demands, in the context of collateral estoppel, " 'that the party to be estopped must have had an identity or community of interest with, and adequate representation by, the losing party in the first action as well as that the circumstances must have been such that the party to be estopped should reasonably have expected to be bound by the prior adjudication.' [Citation.]" (*Id.* at p. 218.)

The facts in *Lewis* are instructive. A safety inspector for the Federal Aviation Administration simulated an engine failure for a deputy sheriff during a helicopter test flight. The helicopter crashed and the sheriff sued, among others, the inspector's employer, the United States, for damages for the personal injuries he sustained in the crash. The case proceeded to trial against the United States alone. The only theory of liability against the United States was its vicarious liability for the tort of its employee, the inspector, under the doctrine of respondeat superior. The federal court concluded that the helicopter crash was caused solely by the inspector's engine failure maneuver, and consequently, the United States was liable for the damages caused by its agent.

The inspector himself filed an action in state court against the deputy sheriff, the county, and others. The trial court granted the defendants' motions for summary judgment on the ground that the federal court judgment precluded the inspector from relitigating liability, even though the inspector was not a party in the federal action. We affirmed because of the identity of interest between the United States and the inspector based on respondeat superior and the adequacy of the United States's representation of their mutual interests.

We wrote: "The identity of interest between the United States and plaintiff—based on respondeat superior—has been noted. As for adequate representation, the United States vigorously disputed Lewis's liability by engaging in a lengthy trial, asserting a number of human and mechanical failures as the cause of the crash, and buttressing those assertions with at least three expert witnesses costing tens of thousands of dollars. One of those experts presented a computer-simulated reconstruction of the crash; the others were deployed on specific issues such as the helicopter's oil consumption, fuel line integrity, and maintenance record. The United States had plaintiff testify extensively as to why the crash occurred. On these facts, we think the United States adequately represented plaintiff's interest for collateral estoppel purposes. [¶] As to whether plaintiff should reasonably have expected to be

bound by the federal decision, it is true plaintiff did not control the federal suit. But the United States can fairly be treated as acting in a representative capacity for plaintiff given their identity of interest and the United States's actions in furthering that interest. Moreover, the ultimate issue in both the federal action and the state action was the cause of the crash. By agreement of the parties to the state and federal actions, much of the discovery was informally consolidated. Plaintiff's counsel participated in at least two critical depositions for the federal action, with all parties stipulating the depositions could be used in either action." (*Lewis*, *supra*, 218 Cal.App.3d at pp. 218-219.)

The present case presents even stronger facts for the application of collateral estoppel. The interests of INA and Aetna/CIGNA/ACE are identical and, like *Lewis*, predicated on principles of respondeat superior. It was INA's employees whose conduct the jury determined constituted the tort of malicious prosecution. There was absolutely no evidence that Aetna/CIGNA/ACE had anything to do with the processing or litigation of Hillenbrand's claim. The parties conceded at trial that INA was acting as the insurer's agent. It was INA, not Aetna/CIGNA/ACE, that controlled when the actions would be filed and how they would be prosecuted. Moreover, unlike the inspector in *Lewis*, INA participated in the trial of the underlying action itself. Its lawyers vigorously challenged each and every element of the tort of malicious prosecution, raising every procedural and substantive issue imaginable and offering a formidable defense. It was not until the trial was completed that INA moved for its directed verdict. INA had both the incentive and the opportunity to fully litigate factual and legal issues in the malicious prosecution proceedings.

We conclude, therefore, that INA is collaterally estopped from challenging liability because it was in privity with Aetna/CIGNA/ACE throughout the litigation. The only evidence to support the malicious prosecution verdict against Aetna/CIGNA/ACE was the evidence that INA's employees filed the declaratory relief actions against Hillenbrand maliciously and without probable cause. INA does not have the right to a new trial to contest the liability that has been conclusively determined in the malicious prosecution trial.

*Punitive Damages*

But Hillenbrand wants an opportunity to prove additional punitive damages. We believe the remittitur in this unique case precludes a second trial on punitive damages. *Ponce v. Tractor Supply Co.* (1972) 29 Cal.App.3d 500 [105 Cal.Rptr. 628] (*Ponce*) provides an apt analogy.

In *Ponce*, a default judgment was entered against an employee of Tractor Supply Co. for $160,000 in general damages suffered by the plaintiffs in an automobile accident caused by the employee. The case went to trial against the employer, and a jury awarded plaintiffs a judgment for $184,000. The employer asserted that the default judgment collaterally estopped the plaintiffs from collecting more from the employer than from the employee. The Court of Appeal agreed. "There is ample authority for the proposition that a party secondarily liable is entitled to the benefits of a prior judgment or ruling in favor of the primary tortfeasor. Thus, a prior judgment in favor of an employee bars an action against an employer whose liability could be predicated only on *respondeat superior*." (*Ponce, supra,* 29 Cal.App.3d at p. 505.)

Similarly, in this case, Aetna's liability was premised exclusively on the conduct of its agent, INA. As we discussed above, however, the trial court carefully assessed the degree of reprehensibility and the other relevant factors necessary to a determination whether a punitive damage award is reasonable. Although the jury had assessed $14 million as exemplary damages, presumably based on the economic wherewithal of Aetna, the court determined that only $3 million was warranted by the nature of the misconduct. Hence, the wealth of another defendant would be irrelevant because, according to the trial court, the conduct itself was not deserving of greater punitive damages. The remittitur then acts as the kind of cap provided by the default judgment in *Ponce*. Hillenbrand is not entitled to a new trial to increase the amount of punitive damages.

The judgment in favor of INA is reversed. The judgment in favor of Hillenbrand but reducing the award of punitive damages is affirmed. Hillenbrand is awarded costs on appeal.

Sims, Acting P. J., and Nicholson, J., concurred.

The petitions of all appellants for review by the Supreme Court were denied March 19, 2003. Werdegar, J., Brown, J., and Moreno, J., were of the opinion that the petitions should be granted.